AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Data Transmission Company et al.,
Intervenors.

No. 1115, Docket 73–1806.

United States Court of Appeals,
Second Circuit.

Argued Aug. 17, 1973.

Decided Oct. 19, 1973.

Hugh B. Cox, Washington, D. C. (Michael Boudin, Washington, D. C., J. Hugh Roff, Jr., Alfred C. Partoll, F. Mark Garlinghouse and Harold J. Cohen, New York City, on the brief), for petitioner American Telephone and Telegraph Company.

Joseph A. Marino, Counsel, FCC, Washington, D. C. (John W. Pettit, Gen. Counsel, and Philip V. Permut, Counsel, FCC, Washington, D. C., on the brief), for respondent FCC.

Thomas E. Kauper, Asst. Atty. Gen., and Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., for respondent United States.

William J. Byrnes, Washington, D. C. (Michael H. Bader, John Wells King and Haley, Bader & Potts, Washington, D. C., on the brief), for intervenors Microwave Communications, Inc. and MCI Telecommunications Corp.

Joseph M. Kittner, Washington, D. C. (Edward P. Taptich, Norman P. Leventhal, Joseph DeFranco, Howard Monderer and McKenna, Wilkinson & Kittner, Washington, D. C., Robert J. Kaufman, New York City, on the brief), for intervenors American Broadcasting Companies, Inc., Columbia Broadcasting System, Inc. and National Broadcasting Co., Inc.

William B. Lawless, New York City (Mudge Rose, Guthrie & Alexander, New York City, on the brief), for intervenor National Easter Seal Society for Crippled Children and Adults.

Michael L. Glaser, Francis E. Fletcher, Jr. and Glaser & Fletcher, Washington, D. C., John M. Scorce, Vienna, Va., for intervenor Data Transmission Co.

Louis L. Hoynes, Jr., Robert J. Kheel, Alexander H. Hadden and Willkie, Farr & Gallagher, New York City, Paul A. Porter, James F. Fitzpatrick, Gary G. Gerlach and Arnold & Porter, Washing-

ton, D. C., for intervenor Commissioner of Baseball.

E. William Henry and Ginsburg, Feldman & Bress, Washington, D. C., for intervenor UPITN Corp.

Before MANSFIELD, MULLIGAN and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this petition by American Telephone and Telegraph Company (AT&T) to review that part of an order [1] of the Federal Communications Commission (Commission) which denied special permission to file occasional user tariff revisions applicable to AT&T's private line service for transmission of television programs, the principal issue is whether the Communications Act of 1934 (the Act) authorizes the Commission to require AT&T to obtain special permission prior to filing such revised tariffs. We hold that it does not.

We grant the petition to review and we set aside the order to the extent that it denies special permission to AT&T to file its occasional user tariff revisions. We also direct the Commission to accept the tariffs in question without further delay and to permit AT&T to place its proposed new rates in effect immediately.

I.

A brief summary of prior proceedings in the context of the Commission's pending investigation of AT&T's rate structure is believed necessary to an understanding of our rulings on the legal issues raised by the instant petition.

In 1965, the Commission initiated an investigation of AT&T's rate levels and rate structure. The purpose of the investigation in part was to determine appropriate ratemaking principles and factors which should govern rate limits for each of the principal categories of service provided by AT&T. Docket No. 16258, 2 F.C.C.2d 871 (1965), reconsideration denied, 2 F.C.C.2d 173 (1965). Specifically, in Phase I–B of this Docket, the Commission was concerned with the rates charged by AT&T for its "competitive" services, such as private line service,[2] and the rates charged for "non-competitive" services, such as long distance message telephone service. The Commission was particularly concerned as to whether the latter were subsidizing the former.

In 1968, AT&T filed a revised tariff providing for an increase in rates for its competitive private line telephone and telegraph services. On April 12, 1968, the Commission suspended the effectiveness of the revised rates and ordered an investigation into their lawfulness. Docket No. 18128, 12 F.C.C.2d 1028 (1968). Ultimately, the record of Phase I–B of Docket 16258 was incorporated[3] into Docket 18128. 18 F.C.C.2d 761 (1969). In October 1969, hearings were

1. 40 F.C.C.2d 901 (1973).

The subject of the instant petition to review is the Commission's memorandum opinion and order which was adopted May 9, 1973 and released May 15, 1973. In the interest of brevity, we refer to it hereinafter as the Commission's "order".

2. Private line service provides the user an exclusive channel for continuous communication between two or more places without the necessity of establishing a new connection for each message. Television program transmission service is a form of private line service offered by AT&T, principally to broadcasting networks and stations, for transmission of television programs between different stations or other locations. Under contract rates, the private line must be taken on a monthly basis; occasional rates are applicable where the user wishes to have the private line established for short or irregular periods.

3. Incorporation was required because in July 1969 the parties to Docket 16258 entered into a stipulation concerning the ratemaking principles and factors relevant to Phase I–B. Since that stipulation contemplated that "effective testing of the complex economic theories of costing and pricing which have been advanced in this record, and the reconciliation of opposing, or at least partially conflicting, views of expert witnesses, can best be accomplished by relating the principles advocated to specific rate proposals", the Commission decided to utilize Docket 18128 for this purpose. 18 F.C.C.2d 761 (1969).

ordered to commence. 20 F.C.C.2d 383 (1969).

Going back for a moment, in January 1968, after a trial type hearing, the Commission issued an initial decision that AT&T rates for contract and occasional users of the television transmission service were unjust, unreasonable and discriminatory within the meaning of Sections 201(b) and 202(a) of the Act, 47 U.S.C. §§ 201(b), 202(a) (1970). AT&T was ordered to file a new tariff. Hughes Sports Network, 25 F.C.C.2d 550 (1970), aff'd in part, 34 F.C.C.2d 641 (1972), reconsideration denied, 38 F.C.C.2d 1052 (1972), petition to review pending, No. 73–1216 (2 Cir. 1973). After AT&T filed a new tariff pursuant to the initial decision in *Hughes*, the Commission suspended it and ordered a hearing to investigate it. Docket No. 18684, 19 F.C.C.2d 1083 (1969). On June 10, 1970, Dockets 18128 and 18684 were consolidated. 23 F.C.C.2d 503 (1970).

During the pendency of the proceedings in these dockets, AT&T continued to file rate changes pursuant to Section 203 of the Act, 47 U.S.C. § 203.[4] At first, when AT&T filed such rate changes, the Commission in some instances chose to suspend them for the statutory three month period and consolidated the investigations of the new rates into Dockets 18128 and 18684. This was done, for example, in an order acting upon a tariff filed by AT&T in December 1971 revising its rates for some private line services. 33 F.C.C.2d 522 (1972). At the conclusion of its

opinion on this tariff, however, the Commission stated that "any further tariff revisions relating to the services under investigation will unduly disrupt or delay the conclusion of the case" in Dockets 18128 and 18684. It therefore provided in paragraph 11 of its order as follows:

"IT IS FURTHER ORDERED, That, in order to best conduce to the proper dispatch of the Commission and to the ends of justice, pursuant to Section 4(j) of the Communications Act of 1934, as amended, Respondents shall file no further tariff revisions relating to the services under investigation in Docket Nos. 18128 and 18684 prior to the entering of a final decision therein unless authorized by special permission of the Commission." 33 F.C.C.2d at 525.

AT&T filed a petition for reconsideration alleging that the special permission requirement was contrary to the statutory plan of the Act. The Commission on July 17, 1972 denied reconsideration and reasserted its claimed authority to issue the original order. 36 F.C.C.2d 484 (1972). The Commission also stated that, since in its view the services at issue in Dockets 18128 and 18684 embrace all of the principal services provided by AT&T, special permission would have to be sought for all major rate changes in these services. Furthermore, to assure expedition of AT&T's requests, the Commission ordered that proposed rate changes "be acted upon within thirty days from the date of receipt".[5] AT&T did not seek review of this decision.

---

**4.** The statutory pattern, discussed more fully at pages 871–872, *infra*, provides for filing of new rates by carriers on their own initiative; for Commission investigation of such rates and their suspension for three months, after which they become effective pending the outcome of the investigation; for carrier accounting of increases collected so that refunds can be made if the new rates are found unjustified; and for setting of new future rates by the Commission after investigation and full hearing.

**5.** After stating that its action was a "temporary and essential administrative measure,

taken to deal with exigent circumstances, prior to a final decision on the merits", 36 F.C.C.2d at 487, the Commission sought to justify its order on the basis that the filings made by AT&T since 1968 presented rate structure and rate component questions which were fundamentally intertwined with the fundamental issue of the rate level relationship among AT&T's services involved in the consolidated proceedings. Therefore, the Commission stated that delay in resolving the consolidated proceedings because of the need to investigate the lawfulness of new tariff filings was unwarranted. 36 F.C.C.2d at 488. The Commission further emphasized

On October 16, 1972, AT&T filed Application Number 903 requesting special permission to file tariff revisions applicable to its television program transmission service. It sought to increase rates charged occasional users and to decrease rates charged contract users. The Commission did not act on this request within thirty days, as it had indicated in its order of July 17, 1972.

Seven months after the application was filed—on May 15, 1973—the Commission issued the order which is the subject of the instant petition to review. 40 F.C.C.2d 901 (1973). The order granted AT&T special permission to file contract user tariff revisions,[6] but denied special permission, at that time, to file occasional user tariff revisions. The theory of the Commission's refusal to permit the filing of occasional user tariff revisions was that such filing would disrupt and delay the resolution of Dockets 18128 and 18684. The Commission also stated that, if the occasional rate proposals were filed,

> "questions would be raised as to the lawfulness thereof, particularly with respect to our decision in *Hughes Sports Network, Inc.;* and, in view of the magnitude of the increases as to individual customers, it is questionable whether an accounting order with provision for possible refunds, would be an adequate safeguard of the rights of occasional users if we should later find the occasional rates to be unlawfully high." 40 F.C.C.2d at 903.

In the order under review, the Commission also stated that in Dockets 18128 and 18684 it would expedite reso-

lution of the question of what the rate structure should be for program transmission service and that it would try to decide the issue within four months. The order provided that, if the issue were still unresolved after 120 days, i. e. by September 12, 1973, AT&T could then file the revised occasional user tariffs on 60 days notice. Such tariffs would then be subject to suspension under Section 204 for an additional three months beyond the 60 days notice period.[7]

On May 25, 1973, AT&T filed its petition to review the order in question, invoking the jurisdiction of this Court pursuant to 28 U.S.C. §§ 2342(1), 2343 and 2344 (1970). On May 31, upon application of AT&T, we ordered an expedited review.

## II.

With this background of prior proceedings in mind, we turn directly to the legal issues raised by the petition to review.

At the outset we wish to make clear what is not involved. Despite the claims of certain of the intervenors, there is no issue before us with respect to the legality of AT&T's proposed tariff revisions. The Commission has made no determination as to their validity.[8] The sole issue before us is a procedural one.

AT&T argues that the Commission's order refusing it permission to file occasional user tariff revisions is invalid because the special permission requirement upon which the order is based is inconsistent with the statutory plan of the Act and is contrary to judicial precedent defining the scope of agency author-

---

that delay would result from investigation of new filings because "the resources of this Commission" were already "severely taxed" by the pendency of the consolidated proceedings. *Id.*

6. With respect to the contract tariff revisions, however, the Commission stressed that, "in allowing these contract rates to be filed and to become effective pending our decision, we are not approving or disapproving such rates and they will be subject to accounting requirement and possible refunds to the extent that they may cause any increas-

es in charges to customers vis-a-vis either the presently effective rates or the pre-October rates." 40 F.C.C.2d at 902.

7. On June 26, 1973, the Commission denied petitions filed by various other parties seeking reconsideration of the May 15, 1973 order. 41 F.C.C.2d 457 (1973).

8. In its June 26, 1973 order, the Commission stated that "[n]o question of lawfulness was determined in our May 15, 1973, action either as to the monthly or the occasional rates." 41 F.C.C.2d at 458.

ity under the Act and comparable regulatory statutes. AT&T also urges that the order be set aside because its underlying premise—that new tariff filings may disrupt or delay pending investigations—is unsupported by findings and is inconsistent with the Act. Alternatively, AT&T argues that the order is void because it is arbitrary and internally inconsistent.

The Commission, on the other hand, argues that the Act authorizes it to postpone temporarily the filing of a tariff revision to avoid disrupting or delaying a consolidated inquiry intended to develop general ratemaking principles to be applied in processing such tariffs; and that under the circumstances of this case the Commission properly exercised its authority temporarily to postpone the filing of the tariff revision in question.

## A. COMMUNICATIONS ACT OF 1934

The Communications Act of 1934, 47 U.S.C. § 151 et seq. (1970), does not require carriers to obtain the approval of the Commission before making changes in their rates. Carriers may initiate rate changes by filing new tariffs with the Commission. Section 203.[9] Such rates may become effective after a specified notice period. *Id.* [10] The Commission may investigate the lawfulness of newly filed rates and suspend their effectiveness for up to three months. Section 204.[11] After this three month period, the rates become effective by operation of law pending the outcome of the investigation. *Id.* The carrier, however, may be required to keep account of increases collected so that refunds may be made if the new rates are found to be unjustified. *Id.*[12]

9. Section 203(a) provides in relevant part that every common carrier shall file with the Commission and make available for public inspection schedules showing its rate charges when a through route has been established, and such schedules must give notice of their effective dates. Section 203(b) provides that "[n]o change shall be made in the charges, classifications, regulations, or practices which have been so filed and published except after thirty days' notice to the Commission and to the public . . . ." Section 203(c) provides that no carrier shall participate in communications unless it has acted in accordance with the above scheme.

10. The provision of Section 203(b) that rates filed may not become effective "except after thirty days' notice" may be waived by the Commission. The Commission previously has extended the notice period from 30 to 60 days. See Amendment of Part 61 of the Commission's Rules, 25 F.C.C.2d 957 (1970), reconsideration denied, 40 F.C.C.2d 149 (1973), petition to review pending sub nom. American Telephone and Telegraph Co. v. FCC, No. 73–1758 (2 Cir. 1973).

11. Section 204 provides in relevant part:
"Whenever there is filed with the Commission any new charge, classification, regulation, or practice, the Commission may either upon complaint or upon its own initiative without complaint, upon reasonable notice, enter upon a hearing concerning the lawfulness thereof; and

pending such hearing and the decision thereon the Commission, . . . may suspend the operation of such charge, . . . but not for a longer period than three months beyond the time when it would otherwise go into effect; and after full hearing the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of the suspension, the proposed change . . . shall go into effect at the end of such period; but in case of a proposed increased charge, the Commission may by order require the interested carrier or carriers to keep accurate account of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased charges as by its decision shall be found not justified. . . . "

12. This refund remedy is in addition to the rights retained by parties injured by allegedly unlawful rates to institute proceedings, either in court or before the Commission, to collect damages from the carrier. Sections 206–08.

In addition, after a full investigation and hearing, the Commission has the authority to determine the lawfulness of either newly filed or previously established rates and in certain instances to prescribe new rates. Section 205.[13]

Since the Act itself does not require prior Commission permission to file new rates, the validity of the order under review turns upon the legality of the special permission requirement. If the Commission had no authority other than that conferred by statute to impose this special requirement, then its order refusing to permit AT&T to file its occasional rate increases is invalid and must be set aside.

■ We hold that the order must be set aside because the imposition of the special permission requirement is contrary to the statutory plan and cannot be justified by prior judicial decisions.

## B. COMMISSION'S VIOLATION OF STATUTORY PLAN

The Commission maintains that the special permission requirement is justified by its broad inherent power to regulate communications carriers and by Sections 1, 4(i), 4(j), 203(b) and 403 of the Act, 47 U.S.C. §§ 151, 154(i), 154(j), 203(b) and 403 (1970). The Commission further asserts that prior judicial decisions establish its authority to promulgate the order under review. We disagree.

■■ We start with the proposition that Congress, rather than purporting "to transfer its legislative power to the unbounded discretion of the regulatory body", FCC v. RCA Communications,

Inc., 346 U.S. 86, 90 (1953), intended a specific statutory basis for the Commission's authority. We also are mindful that Congress, in enacting the carrier initiated rate filing provisions of the Act, struck a "careful balance of interests", United States v. SCRAP, 412 U.S. 669, 697 (1973), and intended that specific statutory authority, rather than general inherent equity power, should provide the agency with its governing standards.

■ The Commission argues that, in addition to the authority prescribed by the detailed statutory scheme, its power to regulate the communications industry is sufficiently comprehensive to validate this type of rate freeze. It urges, on the basis of its inherent power to achieve its ultimate purpose, that it can refuse AT&T permission to file its rate increases because they involve not only traditional common carrier concerns for the Commission but "also could have a detrimental impact upon local broadcasting, and endanger the viability of independent non-network producers, the occasional users of AT&T's service."

While we agree with the Commission that its mandate is comprehensive, see National Broadcasting Co. v. United States, 319 U.S. 190, 219 (1943); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138 (1940),[14] and that in dealing with communications carriers it must be mindful of its responsibilities in the broadcasting field, cf. Carter Mountain Transmission Co. v. FCC, 321 F.2d 359, 362 (D.C.Cir.) cert. denied, 375 U.S. 951 (1963), we nevertheless reject its claim that by virtue of its broad power to regulate the entire communications and

---

13. Section 205(a) authorizes the Commission, if it is of the opinion that any charge of any carrier is or will be in violation of the Act, "to determine and prescribe what will be the just and reasonable charge . . . ." Such determination may be made only "after full opportunity for hearing" upon a complaint or under an order made by the Commission on its own initiative. The Commission is further authorized to order that the carrier shall not "collect any charge other than the charge so prescribed, . . . ."

14. Section 1 of the Act, 47 U.S.C. § 151 (1970), states, *inter alia*, one of the broad purposes in creating the Commission:

"For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . . ."

broadcasting industries the Commission may require a carrier to obtain permission prior to filing tariff revisions.

Sections 203 through 205 of the Act, referred to above, establish precise procedures and limitations concerning the Commission's processing of carrier initiated rate revisions. In a recent decision interpreting a cognate provision of the Interstate Commerce Act, 49 U.S.C. § 15(7) (1970), the Supreme Court stated that this type of statutory scheme "represents a careful accommodation of the various interests involved." United States v. SCRAP, *supra*, 412 U.S. at 697.[15] There the Supreme Court held that the courts could not enjoin the effectiveness of newly filed rates—a surcharge tariff—after the Interstate Commerce Commission had declined to suspend the effectiveness of such rates for the maximum permissible period.[16] The Court described the statutory accommodation achieved by the rate filing provisions as follows:

"The suspension period was limited as to time to prevent excessive harm to the carriers, for the revenues lost during that period could not be recouped from the shippers. On the other hand, Congress was aware that if the Commission did not act within the suspension period, then the new rates would automatically go into effect and the shippers would have to pay in-

creased rates that might eventually be found unlawful. To mitigate this loss, Congress authorized the Commission to require the carriers to keep detailed accounts and eventually to repay the increased rates if found unlawful. To allow judicial suspension for non-compliance with NEPA would disturb this balance of interests." 412 U.S. at 697.

Similarly, in Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658 (1963), where it was held that a district court could not further delay the effectiveness of new rates once the maximum suspension period authorized by statute and invoked by the ICC had expired, the Supreme Court recognized the compromise Congress had attempted to achieve by granting to the ICC a suspension power for a limited period of time.

Thus, in both *SCRAP* and *Arrow*, while the issue was the judiciary's role in the rate making process, the Court recognized the careful accommodation of interests upon which the regulatory scheme was based, including the limitation as to time imposed upon the suspension power granted to the ICC.

In light of the Supreme Court's interpretation of analogous provisions of the Interstate Commerce Act, it is abundantly clear to us that the statutory

15. 49 U.S.C. § 15(7), which is similar to corresponding provisions of the Communications Act, provides in pertinent part that whenever a new rate is filed with the ICC it may suspend the proposed rate change, pending a hearing, for a period not longer than seven months. The statute further provides that, if at the end of the seven month period the hearing to determine the legality of the suspended rate has not been concluded, the rate shall go into effect. The carrier, however, as under the Communications Act, may be required to keep an accurate account of the new rates collected and may be ordered to make refunds where appropriate.

16. *SCRAP* involved the filing of proposed freight rate increases by substantially all of the nation's railroads pursuant to the carrier initiated rate filing scheme of the Inter-

state Commerce Act. The railroads sought a 2.5 percent surcharge on nearly all freight rates as an emergency measure to obtain increased revenues pending adoption of selective rate increases on a permanent basis. The ICC determined not to suspend the surcharge for the seven month period authorized by 49 U.S.C. § 15(7), ordered the proposed selective increases suspended for seven months, and permitted collection of the surcharge during this suspension period. SCRAP, an unincorporated association formed by law students to enhance the quality of the environment, claimed that the ICC orders were unlawful for failure to include a detailed environmental impact statement as required by Section 102 of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(c) (1970). The Supreme Court rejected this claim.

scheme of the Communications Act [17] reflects the realization of Congress that when a carrier is prevented from placing in effect new rate increases it may suffer irreparable loss which in turn may impede the provision of adequate service during a period of rising costs.[18]

■■ In addition to the suspension provision of Section 203, the controls upon Commission action provided in Section 205 further point strongly toward the conclusion that the special permission requirement cannot be justified on the basis of the Commission's inherent power to regulate the communications and broadcasting industries. Section 205 (a) authorizes the Commission "to determine and prescribe" lawful rates. As we have recognized, however, "[t]hat authority is not unlimited." American Telephone and Telegraph Co. v. FCC, 449 F.2d 439, 450 (2 Cir. 1971). The Commission may prescribe a rate only after a "full opportunity for hearing" and after determining that the rate to be prescribed will be "just and reasonable". Section 205(a).[19] Such a hearing and finding are essential to any exercise by the Commission of its authority under Section 205(a). American Telephone and Telegraph Co. v. FCC, supra, 449 F. 2d at 450. True, the Commission in denying the petition for reconsideration of the special permission requirement in the instant case emphasized that "we are not hereby prescribing rates". 36 F.C.C. 2d at 487.[20] We held, however, in American Telephone and Telegraph Co. v. FCC, supra, 449 F.2d at 451 & n. 12, that to determine whether rates have been prescribed the actual impact of agency action and not its form is decisive.

■ What is determinative in the instant case is the incontrovertible fact that the special permission provision under review has the same effect as a Section 205 rate prescription. It compels the carrier to adhere to a fixed rate which can be revised only with prior Commission permission. Section 205 provides, however, that before the Commission can exercise that authority hearings must be held and the prescribed rates must be found just and reasonable. To permit the Commission

---

17. Portions of the Communications Act track the Interstate Commerce Act. See S.Rep. No.781, 73d Cong., 2d Sess. (1934); see page 879, infra.

18. Cf. United Gas Pipeline Co. v. Memphis Gas Division, 358 U.S. 103 (1958), where the Supreme Court, in discussing the limited suspension provision granted to the Federal Power Commission, stated:

"Business reality demands that natural gas companies should not be precluded by law from increasing the prices of their product whenever that is the economically necessary means of keeping the intake and outgo of their revenues in proper balance; otherwise procurement of the vast sums necessary for the maintenance and expansion of their systems through equity and debt financing would become most difficult, if not impossible." 358 U.S. at 113. See United States v. SCRAP, supra, 412 U.S. at 697.

Similarly, the loss sustained when an agency delays a rate reduction can be equally as damaging, for during the delay customers may turn elsewhere and be permanently lost to the carrier.

Moreover, as was pointed out at oral argument in the instant case, if the tariff revisions here involved ultimately are found to be justified, AT&T would have no means of recovering what it would have received had it been permitted to file the rate revisions in accordance with the Act.

19. See note 13, supra.

20. In its order of July 12, 1972 denying the petition for reconsideration, the Commission stated:

"We wish to emphasize that we are not hereby prescribing rates. A decision on whether to grant or deny a request for special permission would not constitute a determination with respect to the lawfulness of the proposed tariffs. It would rather represent a decision on whether it is in the interest of the public and in harmony with the need to protect the integrity of these proceedings to confront, at this late stage, the question of the lawfulness of still further tariff revisions. The decision, furthermore, would not be arbitrary, for [AT&T] would possess an equitable opportunity to justify submitted requests in accordance with the criteria we express herein." 36 F.C.C.2d at 487.

to achieve the same result as it would pursuant to a Section 205 rate prescription, by circumventing the statutory hearing and finding requirements on the basis of its claimed broad inherent regulatory power, would defeat the purpose of Section 205 and vitiate the specific statutory scheme. Under the circumstances of this case, we see no difference between a "prescription" of new rates and a "freeze" of old rates. There is no regulatory authority granted to the Commission by virtue of its power to regulate the communications and broadcasting industries which permits it to circumvent the statutory plan of carrier initiated rate changes, a limited suspension period, rate refunds and rate prescriptions only after a full hearing and specific findings.

United States v. Southwestern Cable Co., 392 U.S. 157 (1968), is not to the contrary. There the Supreme Court sustained the FCC's authority to regulate the emerging community antenna television industry (CATV) and to prohibit expansion of CATV systems' carriage of distant signals pending completion of certain hearings. The Commission argues that the validation in *Southwestern* of its maintenance of the status quo—i. e. its order prohibiting expansion pending a determination of "whether respondents' present or planned CATV operations are consistent with the public interest and what, if any, action should be taken by the commission",

4 F.C.C.2d 612, 626 (1966)—requires us to validate a similar freeze in the instant case.[21] We reject this argument as lacking in merit. The primary issue in *Southwestern* was whether the authority granted to the FCC to regulate "all interstate . . . communication by wire or radio", 47 U.S.C. § 152(a) (1970), authorized the Commission to regulate the CATV industry. See 392 U.S. at 173–78. Congress had made no provision for CATV regulation. After upholding the Commission's regulatory authority to the extent "reasonably ancillary" to its responsibilities with respect to the regulation of television broadcasting, *id.* at 178, the Court held that maintenance of the status quo pending determination of the ultimate course of action was not improper. *Id.* at 178–81.

Since procedures and limitations for ancillary regulation of the CATV industry had not been provided for in the statute,[22] the issue before the Court in *Southwestern* was significantly different from that in the instant case. In upholding the Commission's order in *Southwestern,* the Court did not condone circumvention of statutorily prescribed procedures with consequent frustration of the statutory purpose. In the instant case, however, if the special permission requirement were to be justified by the Commission's general broadcasting regulation authority, the statutory plan for communications carrier rate regulation

21. In upholding the Commission's order in *Southwestern,* the Supreme Court stated:
"Such orders do not exceed the Commission's authority. This Court has recognized that 'the administrative process [must] possess sufficient flexibility to adjust itself' to the 'dynamic aspects of radio transmission,' F. C. C. v. Pottsville Broadcasting Co., *supra,* at 138, and that it was precisely for that reason that Congress declined to 'sterotyp[e] the powers of the Commission to specific details . . . .' National Broadcasting Co. v. United States, *supra,* at 219. And compare American Trucking Assns. v. United States, 344 U.S. 298, 311; R. A. Holman & Co. v. S. E. C., 112 U.S.App.D.C. 43, 47–48, 299 F.2d 127, 131–132. Thus, the

Commission has been explicitly authorized to issue 'such orders, not inconsistent with this [Act], as may be necessary in the execution of its functions.' 47 U.S.C. § 154(i). See also 47 U.S.C. § 303 (r). In these circumstances, we hold that the Commission's order limiting further expansion of respondents' service pending appropriate hearings did not exceed or abuse its authority under the Communications Act." 392 U.S. at 180–81.

22. In *Southwestern,* the Supreme Court held that the Commission's order was not, in form or function, a cease and desist order that must issue only under 47 U.S.C. § 312 (b), (c) (1970). 392 U.S. at 179–80.

would be destroyed. The provisions of Sections 203 and 204 for notice and a limited period of suspension, as well as the prescription requirements of Section 205, would become superfluous if a carrier must seek Commission permission prior to filing rate revisions.

Similarly, cases relied on by the Commission upholding its authority to impose "freezes" on the filing of license applications for broadcasting stations pending adoption of new rules, e. g., Kessler v. FCC, 326 F.2d 673 (D.C.Cir. 1963); cf. United States v. Store Broadcasting Co., 351 U.S. 192 (1956), are inapposite. The upholding of Commission moratoria on the processing of broadcast license applications strikes us as wholly unpersuasive, for the type of restrictions provided for in Sections 203–205 of the Act are not applicable to the license application cases. See, e. g., 47 U.S.C. § 309 (1970).

■■■ We hold that to permit the imposition of a special permission requirement on the basis of the Commission's claimed broad inherent power to regulate the communications and broadcasting industries would frustrate the specific Congressional purpose sought to be achieved by the Act's precise statutory scheme.

## C. COMMISSION'S CLAIM OF STATUTORY AUTHORITY

Having held that the Commission's general authority and inherent regulatory power over the communications and broadcasting industries do not authorize the special permission requirement of the order under review, we turn now to the Commission's claim that such order is authorized by specific sections of the Act. The Commission claims that Sections 4(i), 4(j), 203(b) and 403 of the Act, 47 U.S.C. §§ 154(i), 154(j), 203(b) and 403 (1970), authorize the special permission requirement of the order under review. We disagree.

■■■■ In general terms, Section 403 empowers the Commission to conduct inquiries on its own motion;[23] Sections 4(i) and 4(j) give it authority to issue orders and to conduct proceedings necessary to the execution of its functions and the proper dispatch of its business.[24] The Commission argues that these provisions should be interpreted to uphold its authority to issue the order under review. Its argument rests essentially upon the Supreme Court's decision in Permian Basin Area Rate Cases, 390 U.S. 747 (1968), and on the rule that courts should defer to the informed experience and judgment of the agency to which Congress has delegated the administration of a statute. E. g., Mourning v. Family Publications Service, Inc., 411 U.S. 356, 371–72 (1973).

In upholding the authority of the Federal Power Commission in *Permian* to adopt a system of area rate regulation and to impose supplementary requirements including a moratorium on the filing of proposed rates higher than those determined by the FPC to be just and reasonable, the Supreme Court stated, "[w]e are, in the absence of compelling evidence that such was Congress' intention, unwilling to prohibit administrative action imperative for the achievement of an agency's ultimate purpose." 390 U.S. at 780.[25] The Commission urges, since its purpose is the regulation

23. Section 403 gives the Commission "full authority and power" to institute inquiries on its own motion regarding any matter concerning which the Act authorizes proceedings to be initiated by a complaint.

24. Section 4(i) provides:
"The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."

Section 4(j), in relevant part, provides:
"The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice . . . ."

25. The Court also observed in *Permian* that "the width of administrative authority must be measured in part by the purposes for which it was conferred; . . . ." 390 U.S. at 776. Cf. FCC v. Schreiber, 381 U.S. 279, 292 (1965).

of the communications industry and since the special permission requirement is necessary to achieve that purpose, that we should uphold the Commission's interpretation of the Act and sustain the order under review upon the strength of the *Permian* decision alone. We reject this argument as erroneous on two grounds.

First, *Permian* involved an issue entirely different from that in the instant case. There the moratorium on rate changes by gas companies was imposed after the FPC had prescribed agency made rates pursuant to its prescription power, i. e. after a full hearing and a determination that the prescribed rate was just and reasonable. 390 U.S. at 777–79. Here the Commission specifically has disavowed any intention to prescribe rates. 36 F.C.C.2d at 487. See note 20, *supra.* The Court in *Permian* obviously was addressing itself to a significantly different issue than that before us in the instant case.

Second, the interpretation ascribed by the Commission to the provisions of the Act in question does not withstand scrutiny. Section 4(j) relates only to the procedural conduct of the Commission's business. It does not empower the Commission to circumvent the statutory scheme for filing new tariffs. In FCC v. Schreiber, 381 U.S. 279 (1965), the Supreme Court referred to Section 4(j) (as it had earlier in FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138 (1940)) as " 'explicitly and by implication' delegating to the Commission power to resolve 'subordinate questions of procedure . . . [such as] the scope of the inquiry, whether appli-

cations should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions.' " 381 U.S. at 289. Cf. Federal Broadcasting System v. FCC, 225 F.2d 560, 566 (D.C.Cir.), cert. denied, 350 U.S. 923 (1955). Moreover, while Section 403 authorizes the Commission to institute inquiries on its own motion and confers the same "powers" as if the inquiries had been commenced by complaint or petition, it does not warrant disregard of Sections 203–05. Rather, in exercising authority pursuant to Sections 4(i), 4(j) or 403, the Commission's action must not be inconsistent with Sections 203–05.[26]

Furthermore, the Commission's claim that Sections 4(i) and 4(j) support the special permission requirement of the order under review is inconsistent with the rationale and holding of Willmut Gas & Oil Co. v. FPC, 294 F.2d 245 (D.C. Cir.1961), cert. denied, 368 U.S. 975 (1962). *Willmut* involved an appeal from an order of the FPC which refused to reject a tariff revision filed by a wholesaler of natural gas. Pursuant to the rate filing provisions of the Natural Gas Act, which are similar to those of the Communications Act,[27] the wholesaler had filed annual tariff revisions during the period 1955 to 1960 increasing the price to Willmut, a local distributor. Each rate revision had been filed, and then had become effective after being suspended for the maximum statutory period. Meanwhile, the FPC was investigating the 1955 increase. Before the hearing on the 1960 increase had begun, Willmut petitioned the Commission to

26. In rejecting the Commission's suggested interpretation of Sections 4(i), 4(j) and 403, we are mindful of the maxim that general language of a statute usually does not apply to a matter specifically dealt with in another part of the same statute. See, e. g., Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208 (1932).

27. Section 4(d) of the Natural Gas Act, 15 U.S.C. § 717c(d) (1970), is similar to Section 203 of the Communications Act in that

both contain the thirty day notice provision, although the language of the two sections is different. See note 29, *infra.* Section 4(e) of the Gas Act gives the FPC a suspension power similar to that of Section 204 of the Communications Act except that a maximum period of five months is provided. The prescription authority created by Section 5(a) of the Gas Act is substantially the same as that of Section 205 of the Communications Act. See note 32, *infra.*

reject it. The Commission denied the petition. Willmut appealed and argued *inter alia* that the new filings would frustrate the pending investigation of prior rates and that the Commission could and should have rejected the tariff modifications. 294 F.2d at 246–49. The Court of Appeals for the District of Columbia Circuit rejected these contentions. It held that the Commission had authority notwithstanding subsequent rate revisions to continue its pending investigation "as to whether the rates previously filed were lawful for the period from the date of filing until they were superceded by a later filing, and to order a refund . . . ." *Id.* at 249. The court also held that:

> "Section 4(d) of the [Natural Gas] Act does not give the Commission the discretion to reject schedules of increased rates tendered by a natural gas company . . . . The Commission's power with respect to a filed increase is found in Section 4(e): to initiate a hearing as to the lawfulness of the changed rates, to suspend their effectiveness for a time, and to order refunded that portion of the increase which, after hearing, it determines to be unlawful. Thus the Act provides for investigation of changed rates which have been filed; but it does not contemplate that the Commission may refuse to file a tendered new schedule showing changes in rates, or that it may summarily reject or disallow the new schedule without a hearing." 294 F.2d at 248–49.

The court further held that Section 16 of the Gas Act[28] (the counterpart of Section 4(i) of the Communications Act) did not authorize the FPC to circumvent the rate making scheme set forth in Sections 4(d) and 4(e) of that Act. Cf. United Gas Pipe Line v. Mobil Gas Service Corp., 350 U.S. 332, 343 (1956).

Despite the square holding in *Willmut* —construing a statutory plan for company initiated rate changes similar to that under the Communications Act—that the FPC lacks the authority to "refuse to file a tendered new schedule showing changes in rates, or . . . summarily [to] reject or disallow the new schedule without a hearing", the Commission in the instant case nevertheless maintains that the special permission requirement of the order under review should be upheld. It argues that the statutory scheme of the Communications Act, particularly Section 203(b), is distinguishable from the Gas Act and does not preclude the special permission requirement.

The Commission, in denying the petition for reconsideration of its order with respect to the special permission requirement, stated:

> "Section 203(b) furnishes this Commission with substantially greater latitude than that provided the Federal Power Commission by Section 4(d) [of the Natural Gas Act] with respect to tariff filing practices. Section 203(b) states: ' . . . the Commission may, in its discretion and for good cause shown, modify the requirements made by or under authority of this section in particular instances or by a general order applicable to special circumstances or conditions.' No such grant of authority is conveyed by Section 4(d): that section merely permits the Federal Power Commission to allow tariff changes to take effect without thirty days notice; it does not authorize any other modification with respect to the filing requirement. In our judgment, the requirement of special permission represents a necessary and temporary filing modification in full conformance with Section 203(b)." 36 F.C.C.2d at 487.

We disagree.

---

28. Section 16 of the Gas Act gives to the FPC "power to perform any and all acts, and to prescribe . . . such orders . . . as it may find necessary or appropriate to carry out the provisions of this chapter." Section 4(i) authorizes the FCC to make necessary rules and orders "not inconsistent with" the Act. See note 24, *supra*.

In the first place, the legislative history of Section 203(b) indicates that Congress did not intend to give the FCC substantially greater latitude than was granted to the FPC by Section 4(d) of the Gas Act.[29] Section 203(b) was patterned after Section 6(3) of the Interstate Commerce Act, 49 U.S.C. § 6(3) (1970), and ultimately provided the patern for Section 4(d) of the Gas Act.[30] The Senate Report on the proposed Communications Act stated that subsection (b) of Section 203 was "copied from section 6, [paragraph] (3), . . . of the Interstate Commerce Act." S.Rep. No. 781, 73d Cong., 2d Sess. 4 (1934). The Senate Report also stated:

> "In this bill many provisions are copied verbatim from the Interstate Commerce Act because they apply directly to communication companies doing a common carrier business, but in some paragraphs the language is simplified and clarified. These variances or departures from the text of the Interstate Commerce Act are made for the purpose of clarification in their application to communications, rather than as a manifestation of congressional intent to attain a different objective." S.Rep. No. 781, *supra,* at 2.

It is clear from the legislative history that Section 203(b) conferred no greater power in this respect upon the FCC than was granted to the ICC and the FPC under the statutes administered by them.

Furthermore, we think that a proper interpretation of Section 203(b) indicates that it does not authorize the Commission to circumvent statutory limitations upon its authority imposed by other sections of the Act. Since Section 203(b) only permits modification of "the requirements made by or under the authority of this section", the Commission may not rely upon this section to circumvent the requirements of Sections 204 and 205 relating to the limitation of the suspension period and the prescription procedure. In short, under Section 203(b) the Commission may only modify requirements as to the form of, and information contained in, tariffs and the thirty days notice provision.

The Commission further argues that the three month maximum suspension provision of Section 204 does not preclude the special permission requirement. Its argument is based on *Permian* where the Supreme Court held that, although Section 4(e) of the Gas Act permits the FPC to suspend newly filed tariffs for a limited period of five months,[31] a rate change moratorium is

29. Section 203(b) of the Communications Act provides that no change shall be made in previously filed charges except after thirty days notice to the Commission, which notice shall be published in such form and contain such information as the Commission may prescribe. See note 9, *supra.* The section also provides that "the Commission may, in its discretion and for good cause shown, modify the requirements made by or under authority of this section in particular instances or by a general order applicable to special circumstances or conditions."

Similarly, Section 4(d) of the Gas Act, after providing that no rate change shall be made except after thirty days notice to the FPC, further provides that "the Commission, for good cause shown, may allow changes to take effect without requiring the thirty days notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published."

30. Section 6(3) of the Interstate Commerce Act provides, as do the corresponding provisions of the Communications Act and the Gas Act, that previously filed rates may not be modified except after thirty days notice. The Interstate Commerce Act also provides that "the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions .. . . ." *Id.*

31. Section 4(e) of the Gas Act (like Section 204 of the Communications Act, see note 11, *supra*) permits the FPC to suspend for a

not precluded. We think that the Commission's reliance on *Permian* is misplaced. There the Supreme Court stated:

"Certain of the producers urge that §§ 4 and 5 must in combination be understood to preclude moratoria upon filings under § 4(d). They assert that the period of effectiveness of a rate determination under § 5(a) [pursuant to prescription] is limited by § 4(e); they reason that § 4(d) creates an unrestricted right to file rate changes, and that such changes may, under § 4(e), be suspended for a period no longer than five months. If this construction were accepted, it would follow that area proceedings would terminate in rate limitations that could be disregarded by producers five months after their promulgation. The result, as the Commission observed, would be that 'the conclusion of one area proceeding would only signal the beginning of the next, and just and reasonable rates for consumers would always be one area proceeding away.' 34 F.P.C., at 228." 390 U.S. at 779.

In *Permian*, however, the moratorium was invoked after the FPC had prescribed agency made rates pursuant to Section 5(a) of the Gas Act.[32] The Court in sustaining the moratorium expressly relied upon this prescription authority. · 390 U.S. at 778–79. This is a far cry from the Commission's claimed authority to impose the special permission requirement in the instant case while disclaiming any intention to prescribe rates.

Similarly, other cases relied upon by the Commission to justify the special permission requirement, e. g., United States v. Callery · Properties, 382 U.S. 223, 227 (1965), are inapposite. They merely uphold the FPC's authority to impose, as a condition to the granting of a new certificate of public convenience and necessity required for the sale of natural gas, limitations on the maximum rates. No such rate limitations are applicable to AT&T.

■ In enacting Sections 203–05 of the Communications Act, Congress intended a specific scheme for carrier initiated rate revisions. A balance was achieved after a careful compromise. The Commission is not free to circumvent or ignore that balance.[33] Nor may the Commission in effect rewrite this statutory scheme on the basis of its own conception of the equities of a particular situation.

■ The ultimate effectiveness of newly filed tariffs does not preclude the Commission from completing a pending investigation of rates charged under tariffs that have been superceded. See Willmut Gas & Oil Co. v. FCC, *supra*, 294 F.2d at 249. Neither the filing nor the effectiveness of new rates renders moot a determination of the lawfulness of rates previously charged. The Commission may order a refund of the amounts collected during the period that the prior rates, if found to be unlawful, were in effect. *Id.* Significant questions of law and policy resolved in its adjudication of the old rates can be applied to its evaluation of the new ones. Furthermore, the Commission may pre-

period not longer than five months the effectiveness of newly filed rate changes pending a hearing. If the hearing is not concluded at the end of the five month suspension period, Section 4(e) provides that the rate change shall go into effect and the company may be required to make refunds to the extent that the new rates are ultimately determined to be illegal.

32. Section 5(a) of the Gas Act authorizes the FPC, after a hearing resulting in a finding that any rate collected by a regulated

natural gas company is unjust, to determine the just and reasonable rate to be applicable thereafter. Section 5(a) in this respect is similar to Section 205 of the Communications Act. See note 13, *supra.*

33. This is not to say, of course, that the Commission may never reject a tariff that is demonstrably unlawful on its face—e. g., one that conflicts with a statute. See Associated Press v. FCC, 448 F.2d 1095, 1103 (D.C. Cir. 1971).

scribe rates which are "just and reasonable" and may require the latest tariffs filed to be adjusted to conform to such prescription. During the evaluation, the Commission may suspend the rate changes for the three month period and may further protect users by entering an accounting order for possible refunds. And of course the Commission has adequate resources to arrange its internal procedures and priorities so as to permit consideration of the relevant issues in the most efficacious manner. See American Lines v. Louisville & N. R.R., 392 U.S. 571 (1968); Associated Press v. FCC, 448 F.2d 1095 (D.C.Cir. 1971).

The ratemaking provisions of the Communications Act were intended to provide for orderly processing of proposed rate revisions. See United States v. SCRAP, *supra*, 412 U.S. at 697. In balancing the various interests involved, Congress provided the comprehensive statutory plan discussed above. The Commission is not authorized to circumvent this statutory scheme by making its own equitable adjustments.[34]

We therefore hold invalid and set aside the Commission's order to the extent that it denies special permission to AT&T to file its occasional user tariff revisions.

### III.

Finally, since the action of the Commission already has delayed the filing and effectiveness of the occasional user tariff revisions substantially longer than the maximum notice and suspension periods provided by the Act, the Commission is ordered to accept such tariffs and to permit AT&T to place them in effect immediately under the procedure which the Act authorizes the proponent of a new tariff to follow at the termination of the three month suspension period. See Mississippi River Fuel Corp. v. FPC, 202 F.2d 899, 903 (3 Cir.), cert. dismissed, 345 U.S. 988 (1953).[35]

Petition granted; order set aside to the extent it denies special permission to AT&T to file its occasional user tariff revisions applicable to its private line service for transmission of television programs; and Commission directed to accept such tariffs and to permit AT&T to place them in effect immediately.

34. In view of our decision that the Commission lacks authority to impose the special permission requirement, it is neither necessary nor appropriate for us to reach the questions whether the order under review is arbitrary and internally inconsistent or whether the Commission's determination that the hearings in Dockets 18128 and 18684 will be materially disrupted or delayed by the new tariff filings is supported by adequate findings.

35. We deny the motion by certain of the intervenors to dismiss the petition to review on the ground that the case has been rendered moot by AT&T's filing, on September 13, 1973, of its occasional user rate revisions pursuant to the order under review.

It is well established that the cessation of allegedly illegal conduct does not moot a case where the challenged behavior is likely to recur. United States v. Concentrated Phosphate Export Association, 393 U.S. 199, 203 (1968); United States v. W. T. Grant Co., 345 U.S. 629, 632–33 (1953); United States v. Trans-Missouri Freight Association, 166 U.S. 290 (1897). This is especially so where administrative action is challenged, for consideration of agency orders "ought not to be, as they might be, defeated, by short term orders capable of repetition, yet evading review . . . ." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515 (1911). Cf. Roe v. Wade, 410 U.S. 113, 125 (1973).

Furthermore, the mere filing of the rates referred to does not prevent this Court from granting to AT&T the meaningful relief to which we hold it is entitled. Although the Commission's order permitted AT&T to file its rates after September 12, 1973, such rates may not become effective until the termination of a 60 day notice period and three month maximum suspension period. In contrast to such possible delay, our decision permits AT&T to place its rates in effect at once.