ITT WORLD COMMUNICATIONS INC.,
Plaintiff,

v.

NEW YORK TELEPHONE COMPANY,
Defendant.

RCA GLOBAL COMMUNICATIONS,
INC., Plaintiff,

v.

NEW YORK TELEPHONE COMPANY,
Defendant.

Nos. 74 Civ. 1644, 74 Civ. 2061.

United States District Court,
S. D. New York.
June 19, 1974.

Motion to Vacate Preliminary
Injunction Aug. 26, 1974.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff ITT World

Communications Inc.; H. Richard Wachtel, Charles P. Sifton, Michael R. W. Green, New York City, of counsel.

Cahill Gordon & Reindel, New York City, for plaintiff RCA Global Communications, Inc.; Floyd Abrams, Joel C. Balsam, Michael I. Fink, New York City, of counsel.

George E. Ashley, Edward L. Friedman, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant New York Telephone Co.; Leonard Joseph, Harvey Kurzwill, New York City, of counsel.

GURFEIN, District Judge:

ITT World Communications, Inc. ("ITT") and RCA Global Communications, Inc. ("RCA") move for a preliminary injunction against the New York Telephone Company ("Telephone Company"). Telephone Company moves to dismiss the complaint, pursuant to Rule 12(b)(1) and (6) on the grounds that the Court lacks jurisdiction over the subject matter and that the complaint fails to state a claim upon which relief can be granted. The plaintiffs assert jurisdiction under Sections 214[1] and 406[2] of the *Federal Communications Act.* 47 U.S.C. §§ 214, 406. An evidentiary hearing was held on June 13, 1974.

*The Controversy*

For a number of years the Telephone Company has furnished local distribution facilities in the New York area to ITT and RCA. ITT is an international carrier of voice and data communications by wire and radio, serving customers throughout the United States and abroad from offices in the so-called "gateway" cities of New York, San Francisco, Washington and Miami. RCA is similarly situated. ITT and RCA and their respective customers depend upon the services and facilities of the Telephone Company.

In the past, those services have been furnished to the plaintiffs, among oth-ers, primarily in two forms of local distribution facilities which are telephone lines. These telephone lines permit communications between the international record carriers and their local customers either by voice (telephone) or teletypewriter.

In the New York metropolitan area, ITT serves about 3500 customers, and RCA about 4100 customers who transmit and receive international or interstate telex communications on teletypewriters located in the customers' offices, which are routed directly to far away stations via ITT or RCA facilities in Manhattan.

Those customers using the teletypewriter communications systems as distinguished from voice systems have been serviced by the Telephone Company up to now by facilities compatible with their teletypewriter equipment.

The two principal types of transmission services supplied by the Telephone Company in the New York metropolitan area are known as teletypewriter grade service and voice grade service.

For purposes of transmitting telex or teletypewriter communications, only teletypewriter grade service is presently used by the international record carriers. That service involves the use of *direct* current (DC) developed over a simple copper "wire pair," or a 43 type carrier which can work on DC, but which is, apparently, not in general use. On the other hand, voice grade service may consist of wire pairs or carrier circuits. The carrier circuits require the use of *alternating* current (AC). The equipment of the plaintiffs and the equipment of their customers who use the teletypewriter service is compatible only with the use of *direct* current and cannot be used with the *alternating* current that is used for voice grade service on carrier circuits.

The Telephone Company now proposes to commit itself to supply in the near future only voice grade service, utilizing

---

1. For relevant text of Section 214, see *infra* note 14.

2. For relevant text of Section 406, see *infra* note 20.

a "carrier technology" which permits the simultaneous transmission of large numbers of messages, which operates *only* on alternating current, and which is, concededly, incompatible with the direct current teletypewriter equipment of the plaintiffs and their customers.

Adaptation to the alternating current system can be made by the installation for each telex customer of a pair of modulator-demodulators ("modems") which convert alternating current to use on direct current facilities.

It is estimated that these modems and their installation will require the expenditure of over a million dollars for ITT and a similar amount for RCA.

The engineer who testified for the plaintiffs estimated that a lead time of 2½ years was required for the entire conversion,[3] since the modems would have to be designed and built to order and arrangements made to minimize the interruptions to customers during the changeover. Some interruption of service cannot be eliminated.

### Prior and Pending Proceedings

The Telephone Company has been warning since March 1, 1971, that it was considering replacing the wire pair systems using direct current with carrier systems using alternating current for telex or teletypewriter systems.[4] The plaintiffs and other international record common carriers objected.

The Telephone Company has given several reasons for its intentions. First, it has asserted that the development of the photo telephone made it undesirable to have copper wire pairs adjacent to the carrier circuits. Then it has noted that copper wire pairs were becoming hard to get and that the sub-surface of New York City streets was getting so cluttered with wires that there would soon be no more room for additional wire pairs. Lastly, it has suggested that the new technology simply had to

supersede the old, because it would be much more efficient.

To trace the controversy to its present legal stance we must go back a little. The international record carriers ("other common carriers"), like the plaintiffs, operated under agreements with the Telephone Company which substantially required the other common carriers to pay rates comparable to those set forth in the New York State Public Service Commission ("PSC") schedules, applicable to local users. There was in effect Tariff PSC No. 800 which related to similar services rendered to local customers like banks, brokerage houses and airlines. Under Tariff PSC No. 800, there had been a sharp difference in rate between teletypewriter grade service to telex systems and voice grade service, the former being much cheaper.

When negotiations between the Telephone Company and the international record carriers came to a standstill, the Telephone Company filed Tariff PSC No. 808 on September 25, 1973, to be effective October 26, 1973.

Tariff PSC No. 808 set forth the rates, terms and conditions to be applicable to the furnishing of local distribution facilities to "other common carriers." "Other common carriers" was defined to include "specialized common carriers, domestic or international public record carriers and domestic satellite carriers" which are not engaged in the business of providing ordinary telephone service. Tariff PSC No. 808 thus did not apply to other telephone companies or to local users who did not come within the definition.

Tariff PSC No. 808 had three important provisions: (1) Two point wire pair facilities working on DC and two point voice grade facilities were offered at a *single* rate—the higher rate—which would result in an increase of 71% to the international carriers over the rate they were paying. (2) The Telephone

---

3. *Intartaglia*, tr. 67–68.

4. Roth, Affd. in Support of Application for Order to Show Cause and Preliminary Injunction, 74 Civ. 1644 MIG, Ex. A.

Company would no longer be required to provide wire pairs where the distance between the Telephone Company's central office providing facilities to another common carrier and the central office providing facilities to the customer of the other common carrier is in excess of five miles. (3) After October 1, 1975, the Telephone Company would not be obligated to furnish wire pairs, irrespective of the distance between the two serving central offices.

Tariff PSC No. 808 did not provide at all for 43 carrier grade service which could utilize DC current. It appears that, after October 1, 1975, no DC current service will be available.

Upon objection by ITT, the PSC, on October 24, 1973, deferred the effective date of Tariff No. 808 until February 23, 1974, and initiated formal proceedings concerning its propriety.

Before the PSC had time to act, except tentatively on rates, the Federal Communications Commission ("FCC") on October 4, 1973, wrote to American Telephone and Telegraph Co. that tariffs governing local distribution facilities should have been filed by its subsidiaries (which include the New York Telephone Company) with the FCC rather than the State Commission, and directed such filing.

Under protest, the Telephone Company, on November 12, 1973, filed a tariff provision with the FCC which was identical in all relevant respects with Tariff PSC No. 808. The proposed tariff, Tariff FCC No. 37 was to become effective on February 24, 1974. Its definition of "other common carriers" to whom alone it was to apply remained the same.[5]

When the FCC ordered the filing of Tariff No. 37, the PSC deferred the effective date of Tariff PSC No. 808 to August 23, 1974. It is thus not yet in effect.

Following the filing of Tariff No. 37, a number of petitions to suspend or reject the proposed tariff were filed with the FCC by certain common carriers. On January 11, 1974, the Commission released a Memorandum Opinion and Order in which, considering Tariff No. 37 (with some others), the Commission agreed that the "petitioners [not including plaintiffs] have raised certain substantial questions with regard to the lawfulness of the tariffs which warrant further investigation." It deferred further action on the pleadings, however, "pending further proceedings we have initiated on December 12, 1973, in In the Matter of Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers, et al., in Docket No. 19896 (FCC 73–1299; released December 13, 1973)".[6]

ITT petitioned the FCC on January 17, 1974, to reject, and on January 18, 1974, to suspend Tariff No. 37. On February 19, 1974, the Commission denied the petitions.[7] It should be noted that, aside from a technical argument that the rates were not specifically set forth as required by FCC Reg. § 61.74, the main thrust of ITT was that the tariff was discriminatory in alleged violation of Section 202(a) of the Communications Act of 1934, 47 U.S.C. § 202(a), and that the charges, etc., were not reasonable in violation of Section 201(b), 47 U.S.C. § 201(b). No reference was

---

5. The Telephone Company filed a petition for review with the Court of Appeals for the Second Circuit, contending that the furnishing of local distribution facilities was subject to *state* regulation. The petition was transferred to the Third Circuit where it is now pending. This Court assumes, for purposes of this case, the validity of the Commission's ruling that it, rather than the PSC of New York, has jurisdiction.

6. In the Matter of Bell System Tariffs re Entrance, Intercity and Local Distribution Facilities for Other Carriers, (FCC 74–36; released January 11, 1974) (¶ 9).

7. In the Matter of New York Telephone Company, Tariff FCC No. 37 Offering Local Distribution Facilities for Use by Other Carriers, (FCC 74–148; released February 19, 1974).

made at the time to any alleged violation of Section 214.[8]

Tariff No. 37 became effective on February 24, 1974.

On March 11, 1974, ITT filed a "Petition for a Stay" of the Telephone Company's "proposed discontinuance of 'teletypewriter grade' service *as evidenced by the rates filed* by [the Telephone Company] as amendments to its Tariff FCC No. 37." (Emphasis supplied.) ITT argued that for the Telephone Company to discontinue furnishing teletypewriter grade service, it must first obtain requisite authority from the Commission under Section 214(a) of the Act.[9] It pointed out that in PSC No. 800, the Telephone Company regarded "teletypewriter grade" service as separate and distinct from "telephone grade" service, and requested the Commission to determine "the threshold 214 question before permitting [the Telephone Company] to discontinue 'teletypewriter grade' service."

In its Memorandum Opinion and Order adopted March 28, 1974, the Commission completely ignored the contention of ITT and RCA (as well as Western Union International) that the Telephone Company was discontinuing a service without a certificate of convenience and necessity under Section 214. Instead, the Commission paraphrased the petitioner's contention in this way:

"As to the Section 214 contention of petitioners, we think it is clear that NYT is not discontinuing any service to a community or part of a community *by publishing the dollars and cents rates* in its tariff as our rules and Section 203 of the Act require. Petitioners will continue to obtain local distribution facilities and service on and after March 30, 1974, as in the past, and they will continue to be able to serve their own customers through the use of such local distribution facilities and service as in the past. However, petitioners will be paying more for such service than they now pay under alleged oral contracts that have never been filed with the Commission. This increase in charges does not constitute a violation of Section 214. The objectives of Section 214 could be defeated if we were to suspend or reject the revised tariff as petitioners request, for NYT would then be required under Section 203 of the Act to discontinue local distribution service to petitioners as well as all other carriers." (Emphasis supplied.) [10]

It allowed certain corrective revisions to Tariff No. 37 "to become effective on March 30, 1974, without suspension or rejection and without approval or disapproval by us, but subject to further proceedings we expect to hold in due course on the lawfulness of all the Bell System Tariffs offering interconnection facilities to other carriers." [11]

The Commission seemed to believe that if it considered the elimination of direct current service as a separate matter, it would have to reject the whole tariff and that the Telephone Company would then be in violation of Section 203 which mandates the filing of "schedules showing all charges." It did not consider, moreover, whether as the plaintiffs claim, they have *contracts* which would survive the absence of a tariff schedule.

---

8. RCA filed a "Petition for Declaratory Ruling, or in the Alternative, Suspension" with the Commission on March 6, 1974, and also failed to raise the § 214 question (Ex. B to Entwistle Affd. in 74 Civ. 2061 MIG). It did raise that issue in a "Petition for Reconsideration" of the Commission's opinion of April 2, 1974 (FCC 74–296), *infra*, in the light of its subsequent decision of April 23, 1974 (FCC 74–457), *infra*, on May 2, 1974. The Court has not been informed of any decision by the Commission on RCA's petition.

9. Ex. P. to Entwistle Affd. in 74 Civ. 1644 MIG.

10. In the Matter of New York Telephone Company Tariff FCC No. 37 Offering Local Distribution Facilities for Use by Other Carriers, (FCC 74–294; released April 2, 1974) (¶ 8).

11. *Id.* at ¶ 9.

No authority was cited in support of the Commission's position.

We should take note of one more FCC proceeding. In In the Matter of Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers, et al., (FCC 73-1299; released December 13, 1973) (referred to in, and pending further proceedings at the time of its Memorandum Opinion and Order was released on January 11, 1974), the Commission ultimately made a number of decisions on April 23, 1974 [12] regarding "other common carriers," but failed to consider the question of whether the Telephone Company was required to comply with Section 214 and obtain a certificate before discontinuing direct current service to "other common carriers." It again announced that if further hearings on the force and effect of certain contracts between Western Union and Bell did not resolve the controversy between Bell and the other carriers [including the plaintiffs] yet another separate proceeding could be had with "such hearing as may be necessary to develop fully all the pertinent facts and circumstances." [13]

On April 11, 1974, ITT filed its complaint in this Court. On May 13, 1974, RCA filed its complaint in this Court.

In the meantime, ITT has also filed a petition for review with the Second Circuit. RCA has not done so. In view of the Commission's statements that it intends to hold further hearings on the matter and the pendency of RCA's petition for reconsideration, it is doubtful that any "final order" which is appealable has been made by the Commission. See 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1).

With the lead time for conversion of their equipment two and a half years, and the effective date of the Telephone Company's right not to furnish service by direct current being October 1, 1975, sixteen months off, and with no decision in the offing, the plaintiffs and their engineers, as well as their financial and customer relations personnel, are naturally concerned. They think that they have a right to know where they stand before they take the serious steps that conversion to alternating current would require or lose potential new customers for lack of a definitive resolution of the problem.

The Telephone Company contends that this action is simply an improper collateral attack upon a tariff and orders of the FCC. It argues, further, that there is primary jurisdiction over the subject matter of the complaint in the Commission and that ITT and RCA have failed to exhaust their administrative remedies, or their right of review. Finally, it urges that the plaintiffs have failed to establish any right to a preliminary injunction.

I

■ There is no doubt that the doctrine of primary jurisdiction must be applied where it is applicable. To the extent that there is complaint of the unreasonableness of the *rate*, the FCC has primary jurisdiction under the doctrine of Texas and Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 448, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Even if the complaint is that the rate is *discriminatory*, the primary jurisdiction lies in the Commission, Robinson v. Baltimore & Ohio R. R., 222 U.S. 506, 511, 32 S.Ct. 114, 56 L.Ed. 288 (1912); Danna v. Air France, 334 F.Supp. 52 (S.D.N.Y.1971), aff'd, 463 F.2d 407 (2 Cir. 1972). I assume it would apply also on whether different services to different customers is discriminatory. The reviewing authority is exclusively in the Courts of Appeal. 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1).

■ The attack here is not on the rates, however. While rates are a part

12. In the Matter of Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers, et al., (FCC 74-457; released April 23, 1974).

13. *Id.* at ¶ 51.

of the filed tariff, the request for judicial relief under Section 214 does not encompass a review of the reasonableness or the alleged discriminatory character of the rates by the District Court. Those issues remain in the primary jurisdiction of the FCC.

The gravamen of the claim here is different. It seeks relief under the provisions of Section 214 which gives jurisdiction to this Court to enjoin violation of its provisions at the suit of any party affected.[14]

■ Section 214 is not an exception to the doctrine of primary jurisdiction. It is in aid of primary jurisdiction. It leaves exclusively within the jurisdiction of the Commission the determination of whether to grant a certificate of convenience and necessity and to determine in a proper proceeding whether a certificate is necessary in the premises.

■ The burden is cast upon the carrier which wishes to discontinue a service to make proper application for a certificate.

The Telephone Company has not applied for such a certificate. It has, instead, simply announced its intentions in a filed tariff which tells "other connecting carriers" what it is offering in the way of facilities.

This poses questions of law. Is the teletypewriter grade service rendered to the plaintiffs under PSC Tariff No. 800 a discrete service, different from the voice grade service? Does withdrawal of this service constitute a "discontinuance, reduction or impairment of service?" Is there a "community or part of a community" involved? Finally, if the Telephone Company was required to seek a certificate and failed to do so, is

it subject to injunction under Section 214 in the light of the proceedings already had and to be had in the Commission?

The history of the teletypewriter grade service tends to establish that it is a discrete service. This is shown by the circumstance that it was treated as a separate service with a separate rate when the Telephone Company was filing tariffs with the State Commission over the years, because it appears to have been so treated in its contractual relations with other connecting carriers, and because it is the only service compatible with teletypewriter equipment.

The Telephone Company has conceded that Tariff No. 37 offers only voice grade facilities.[15] The FCC recognized this itself in considering the position of Western Union in the proceeding referred to above.[16] There Western Union had leased substantial portions of its local distribution from Bell [the Telephone Company] pursuant to privately negotiated contracts.[17] Bell served notice of termination to take effect September 28, 1978. Western Union argued that under its contract it was specifically entitled to lease "wire pairs" and was not required to accept voice grade circuits—"a service substantially different." This is the same as the claim made by ITT and RCA.

The Commission concluded that Bell proposes to take action which will result in the discontinuance or impairment of services and that "the regulatory scheme of the Act and the public interest requires that we review any actions taken in alleged violation of a contract or a tariff to insure compliance with Section 214."[18]

14. Section 214 of the Act, in pertinent part reads as follows:
". . . No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby . . . . ."

15. Opposition Memorandum filed with FCC March 15, 1974.

16. In the Matter of Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers, et al., (FCC 74–457; released April 23, 1974).

17. *Id.* at ¶ 33.

18. *Id.* at ¶ 37.

■ It is not for this Court to decide the issue.[19] It is for the Court to determine if the issue of whether a certificate is required should be preserved for the jurisdiction of the Commission before it becomes moot in a practical sense.

■ If the Telephone Company is effecting an impairment of service, the mere filing of a tariff does not make lawful what is otherwise unlawful. Press Wireless, Inc. v. FCC, 105 U.S. App.D.C. 86, 264 F.2d 372 (1959), aff'g per curiam, 17 Radio Rep.2d 217 (FCC 1958).

■ No authority has been cited to the effect that "a community" in Section 214 means only a geographical entity like a town or village. Although the only administrative authority found is tentative (Bunker Ramo Corp. v. Western Union Telegraph Co., 31 FCC2d 449 (1971)), nothing has been offered to show that "community" does not include an economic "community" of users, such as international record carriers or domestic satellite carriers. In fact, there is impairment of direct current service in a geographic *area* of metropolitan New York more than five miles from the central station. The important concept of "community" in Section 214 I take to be the public interest. In the issue here raised, the inconvenience to the customers of the international record carriers is at least as great as to the carriers themselves.

## II

Having determined that there is considerable merit to the contention that the teletypewriter grade service is a discrete service and that the offering of the Telephone Company in Tariff FCC

No. 37 may include an impairment of service prohibited by Section 214 in the absence of a certificate of public convenience and necessity, we must consider the interrelation of the injunctive power vested in the District Court under Section 214 and the jurisdiction of the Commission.

It seems clear that if there was an impairment of service within the federal jurisdiction, without any reference by the putative violator to the Commission, there would be jurisdiction in the District Court to enjoin, or the Section would have no meaning. When the putative violator does not ignore the Commission entirely but files a tariff embodying the alleged impairment of service instead of applying for a certificate, should the District Court take jurisdiction?

■ An important consideration in the ordering of an injunction under Section 214 is whether the public interest requires it. As we have seen, although the adversaries are the common carriers, the impact of an impairment of service would also fall on the customers of the other carriers and presumably on their customers as well.

It may well be argued in certain cases that there should be a full exhaustion of remedy in the Commission before a court acts. That would be true where the proposed discontinuance or impairment of service will not become effective until a decision has been reached by the Commission. This case comes to the Court in a rather different posture.

By setting precise effective dates for limitation of service and for the ultimate right to abandon the service in a filed tariff (October 1, 1975), the Telephone Company has created a plan under

---

19. RCA cites cases which are said to hold that a difference in method of distribution spells an impairment of service. I accept the rationale merely as indicating that it raises an issue fairly to be met but not as controlling on the merits, which this Court will not decide.

FCC Rule 63.62, 47 C.F.R. § 63.62 provides for authority for discontinuance, reduction

or impairment to be requested by formal application when there is " . . . (f) Any other type of discontinuance, reduction or impairment of telephone or telegraph service not specifically provided for by other provisions of this part (for contents of application, see § 63.505)."

which every day of delay in adjudication makes the lead time available for conversion to alternating current one day less. A proceeding for a certificate of convenience and necessity, as distinguished from a mere tariff filing, on the other hand, would have been determined one way or the other with a degree of finality, subject only to Court of Appeals review.

It is the very argument that there has not been, nor will there be, such impairment of service as requires a certificate that makes judicial intervention desirable. If the Telephone Company stands on that position it will *never* apply for the certificate. The Commission may take an inordinate time in a general proceeding on the lawfulness of rates before deciding what is, in essence, a collateral issue in such a proceeding. I think the public interest, as well as fairness to the litigants, requires that the Commission act promptly.

While some efforts have been made by the plaintiffs to request a decision of the Commission under Section 214, the Commission has not been responsive. It must seem to an observer that the Commission has elided the issue by apparently considering it as a function of the rates charged rather than as a question of whether there is an impairment of a service and, concomitantly, whether the impairment is permissible in the public interest.

If lead time, with substantial implications, were not involved, it might be proper to let the Commission exhaust the remedy. In the present posture, I am afraid the public will be exhausted before the remedy.

■ The foregoing is not to be considered an intimation on the merits. It is for the Commission, and the Commission alone in the first instance, to determine the controversy. While the FCC cannot suspend the entire tariff after the statutory period, American Telephone & Telegraph Co. v. FCC, 487 F.2d 865 (2 Cir. 1973), I believe it can and should decide, in a separate proceeding, whether the inclusion of the alleged impairment of service in Tariff No. 37 was proper and whether a certificate is required and should be granted or denied. The continuing confrontation between advancing technology and limited resources against existing techniques and equipment is for the Commission, with its expert knowledge, not for the courts.

### III

All parties seem to agree that there is no precedent making the requisites for a preliminary injunction under Section 214 different from the usual considerations of equity.

The plaintiffs have shown that there is a public interest in an early determination of the controversy. They have raised serious questions going to the merits on the applicability of Section 214.

■ An injunction in limited terms is justified under the tests formulated by this Circuit. In Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2 Cir. 1969), Judge Waterman wrote:

"... 'the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.' Dino De Laurentiis Cinematografica, S.p.A. v. D–150, 2 Cir., [366 F.2d 373] at 375. In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation [citing cases]."

It may be true that the plaintiffs can be made whole by the award of damages or by an accounting order of the Commission. On the other hand, grave inconvenience may result, an inconvenience that appears to be unnecessary in the circumstances. On a balance of convenience, it is scarcely likely that before the Commission makes a decision under Section 214 the Telephone Company will

be entirely without copper wire or that the streets of New York will not take some more circuits with copper wire pairs. Progress, if it wins, will not have been delayed so long a time as to be detrimental to the vital interests of the Telephone Company.

As a result of this injunction, the Telephone Company will now be in a position to petition for a certificate of convenience and necessity without admitting that it requires one. The Commission, it is hoped, can entertain the Section 214 question either at the instance of the Telephone Company or on its own initiative. The Commission, if it should decide in favor of the Telephone Company can, in its expert discretion, fix a date for an alteration of service to the other common carriers which will afford sufficient lead time, on adequate notice, for the conversion to alternating current that would be required. Lastly, the primary jurisdiction of the Commission is preserved without unnecessary inconvenience to the public, and there is reserved to the Commission exclusively the determination of whether the Telephone Company is discriminating against the plaintiffs in favor of other telephone companies (Bell and non-Bell) and local users.

The motion to dismiss is denied.

The defendant will be enjoined from reducing or impairing the provision of direct current teletypewriter grade service in the New York metropolitan area heretofore provided by the defendant to ITT and RCA pending the disposition of this action or until the FCC either determines that a certificate of public convenience and necessity pursuant to Section 214(a) of the Communications Act of 1934, 47 U.S.C. § 214(a) should issue with respect to such discontinuance, reduction or impairment, or is not required. The rates in the filed Tariff No. 37 will continue to be paid, however, subject to refund under an accounting order of the Commission.

No mandatory order will issue under 47 U.S.C. § 406.[20]

The foregoing constitutes the findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Submit decree on five days' notice.

## MOTION TO VACATE PRELIMINARY INJUNCTION

The New York Telephone Company ("Telephone Company") in a motion filed July 15, 1974, seeks a vacation of the order of this court filed on July 2, 1974, enjoining the defendant from reducing or impairing the provision of direct current teletypewriter grade service in the New York metropolitan area heretofore provided by the defendant to ITT World Communications, Inc. ("ITT") and RCA Global Communications, Inc. ("RCA") pending the disposition of this action or until the Federal Communications Commission ("FCC") either determines that a certificate of public convenience and necessity pursuant to Section 214(a) of the Communications Act of 1934, 47 U.S.C. § 214(a) should issue with respect

20. 47 U.S.C. § 406 provides in pertinent part:

"The district courts of the United States shall have jurisdiction upon the relation of any person alleging any violation, by a carrier subject to this chapter, of any of the provisions of this chapter which prevent the relator from receiving service in interstate or foreign communication by wire or radio, or in interstate or foreign transmission of energy by radio, from said carrier at the same charges, or upon terms or conditions as favorable as those given by said carrier for like communication or transmission under similar conditions to any other person, to issue a writ or writs of mandamus against said carrier commanding such carrier to furnish facilities for such communication or transmission to the party applying for the writ." It is unnecessary, in view of the foregoing decision pursuant to Section 214, to decide whether relief in the nature of mandamus is appropriate under Section 406. I would doubt that such relief is available, in any event, because of the doctrine of primary jurisdiction. See MCI Communications Corp. v. American Telephone & Telegraph Co., 496 F.2d 214 (3 Cir. 1974), rev'g 369 F.Supp. 1004 (E.D.Pa.1974).

to such discontinuance, reduction or impairment, or is not required.[1]

The Telephone Company contends that since this Court's opinion of June 19, 1974, the FCC has, in fact, held that a certificate of convenience under Section 214 is not required. This contention is based on a memorandum opinion and order of the FCC adopted June 26, 1974, (FCC 74–690; Docket No. 20099) and a memorandum opinion and order adopted June 25, 1974 (FCC 74–655; Docket No. 19896). I have carefully considered these opinions of the Commission and find that they do not support the interpretation of the movant.[2]

The June 25 order, In the Matters of Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers, denied a petition by Western Union International, Inc. to reconsider an earlier decision by the FCC (FCC 74–457; released April 23, 1974), stating:

> "In our Decision [FCC 74–457] we noted that if the IRCs[3] could not resolve their differences with Bell, we would consider their contentions in a separate proceeding where a determination may be based on a full showing of all the relevant facts concerning the arrangements between Bell and the IRCs. We see no reason to change that determination."

FCC 74–655 at ¶ 2.

The next day, June 26, a separate proceeding—"a formal investigation and hearing"—was ordered in FCC 74–690, Docket No. 20099. This proceeding was to include many issues, among them whether there were informal contracts under which the Commission should require that certain facilities be furnished pursuant to such informal contracts rather than pursuant to filed tariffs

(FCC 74–690, ¶ 13.6) and "whether there is any justification for providing only voice-grade facilities" (FCC 74–690 at ¶ 13.22).

The movant urges that, since the investigation was ordered "pursuant to the provisions of Section 4(i), 201–205, 211 and 403 of the Communications Act, as amended," (FCC 74–690 at ¶ 12) and not pursuant to Section 214, it may be inferred that the Section 214 problem had already been disposed of.

The opinion of June 26 referred to a petition for reconsideration filed by RCA on May 2, 1974, of a memorandum opinion of the FCC of April 2, 1974, and denied the petition. The basic contention (which was rejected) was that RCA had informal and unwritten contracts with the Telephone Company, which were not superseded by Tariff FCC No. 37. The Commission repeated its position that "we would need additional information as to these arrangements before undertaking to take remedial action." (FCC 74–690 at ¶ 10). The Commission made no reference to Section 214.

In the opinion filed on June 19, 1974, I indicated that the injunction would remain in effect until the Commission decided that a certificate is not required under Section 214. That would be a simple unambiguous formulation. I have been shown no such statement by the Commission. Indeed, after this Court's opinion, and after the FCC orders now relied upon by the Telephone Company, the Common Carrier Bureau of the Commission informed AT&T, under date of July 15, 1974, that in the proceeding in FCC 74–690, Docket No. 20099, between the Telephone Company and the international record carriers two issues remain to be considered with re-

---

1. The opinion upon which the order is based is reported at 381 F.Supp. 113 (S.D.N.Y. 1974).

2. Since this motion was pending in the District Court when the protective appeal was filed on August 1, 1974, the appeal may be deemed premature and the District Court is not ousted of jurisdiction. United States v. Crescent Amusement Co., 323 U.S. 173,

177–178, 65 S.Ct. 254, 89 L.Ed. 160 (1944); Hawkins v. Lindsley, 327 F.2d 356, 359 (2 Cir. 1964); 9 Moore, Federal Practice § 203.11 n. 14 (1973). All proceedings in the Court of Appeals have been stayed by that court in view of the pendency of this motion. I will treat that as an order permitting the District Court to proceed.

3. International record carriers.

spect to the provision of interconnection facilities to the international record carriers, namely: "(1) Should the interconnection facilities be furnished pursuant to contract rather than pursuant to tariff, and (2) would the elimination of direct current teletypewriter grade service constitute a discontinuance of service under Section 214 of the Communications Act."

While an interpretation of an order of the Commission by its Common Carrier Bureau would not bind the Court, its statement of what is on the docket of the Commission is entitled to weight. It substantiates my own reading which suggests that the definitive ruling required for vacation of the injunction has not yet come.

MOTION FOR REARGUMENT

The alternative motion for reargument is denied since no new matter is raised, and I adhere to my original opinion.

It is so ordered.