TRT TELECOMMUNICATIONS
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Western Union Telegraph Company,
Western Union International, Inc., FTC
Communications Inc., MCI Interna-
tional, Inc., Intervenors.

WESTERN UNION INTERNATIONAL,
INC. and MCI International,
Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

FTC Communications, Inc., Western
Union Telegraph Co., Intervenors.

FTC COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Western Union Telegraph Company,
Western Union International,
Inc., MCI International, Inc., Intervenors.

Nos. 86–1685, 86–1710 and 86–1740.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 8, 1988.

Decided Sept. 23, 1988.

1536

E. Edward Bruce, with whom Christopher T. Curtis, Washington, D.C., for TRT Telecommunications Corp., Ruth S. Baker-Battist, Washington, D.C., for Western Union Intern. Inc. and MCI Intern., Inc., Roger P. Newell, New York City, for FTC Communications, Inc., John M. Scorce and Ellen G. Block, Washington, D.C., for MCI Intern., Inc., were on the joint brief for petitioners. Lloyd D. Young, Washington, D.C., also entered an appearance for petitioner TRT Telecommunications Corp. in 86–1685.

John E. Ingle, Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Nancy E. Stanley, Linda L. Oliver, Counsels, F.C.C., John J. Powers, III and David Seidman, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Catherine O'Sullivan, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.

Joel Yohalem, with whom H. Richard Juhnke, Arthur H. Simms and Peter G. Wolfe, Washington, D.C., were on the brief, for intervenor Western Union Corp.

Ellen G. Block and John M. Scorce, Washington, D.C., entered an appearance, for intervenors Western Union Intern., Inc. and MCI Intern., Inc. in 86–1685 and 86–1740.

Ruth S. Baker–Battist, Washington, D.C., entered an appearance, for intervenors Western Union Intern., Inc., and MCI Intern., Inc. in 86–1740.

Roger P. Newell, New York City, entered an appearance, for intervenor, FTC Communications Inc. in 86–1685 and 86–1710.

Before WALD, Chief Judge, and ROBINSON and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

Telex and TWX are services that allow subscribers to communicate with each other by means of teletypewriters. Much in the manner of using a conventional telephone, a subscriber to the service can dial the number of another subscriber and, once "on line," send written data.[1] During the period at issue in this case, Western Union ("WU") provided domestic Telex/TWX service; in addition, five companies known collectively as the "interconnected carrier parties" ("ICPs") provided international connections.[2] WU and the ICPs had exclusive control over domestic and international lines, respectively; a subscriber therefore used lines supplied by both in order to send overseas messages that either originated or terminated in the United States. The dispute before us concerns the division of revenues between WU and the ICPs for these transnational messages.

I

A

The history of the stormy WU–ICP relationship is beginning to rival that of the legendary squabble between the Hatfields and the McCoys. One pivotal difference, however, is that the parties here very much remember what their long-lived dispute is all about. It is over rates. But, before turning to the recent history of the revenue divisions that gave rise to this dispute, it is needful to recall the familiar outlines of the ratemaking mechanisms provided by the Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S. C.).

Under the Communications Act, common carriers, such as WU, offer their communications services to the public pursuant to tariffs filed with the FCC. 47 U.S.C. § 203 (1982). As with other rate regulatory mechanisms, rates filed under the Act must be just, reasonable, and not unduly preferential. *Id.* §§ 201(b), 202(a). Under section 203, carriers initiate the ratemaking process by filing tariffs which may take effect after prescribed notice periods. The FCC may reject a tariff outright if it is "patently unlawful." *See Western Union Int'l v. FCC, supra,* 652 F.2d at 141 n. 14. Alternatively, the Commission may set the rates for investigation and hearing. 47 U.S.C. § 204(a). In addition, the Commission may suspend the effective date of a filed tariff for a period of up to five months. After the five-month period has elapsed, the rates become effective, and a customer is obliged to pay at the designated rate. In the event the rates are later found unlawful, the Commission may require the carrier to effect a refund. 47 U.S.C. § 204(a).

A very different rate mechanism for setting rates is (or, more precisely, was) provided by section 222 of the Act, which, as the parties agree, controlled WU's provision to the ICPs of "outbound" service (service originating in the United States) at

---

1. For a detailed description of the background which we briefly recount here, *see generally FTC Communications, Inc. v. FCC,* 750 F.2d 226, 227–31 (2d Cir.1984) (petition for review of FCC's *Final Decision* and interim prescription order); *Western Union Int'l v. FCC,* 652 F.2d 136, 138–42 (D.C.Cir.1980) (dismissing as premature petition for review of early FCC orders in this proceeding).

2. The ICPs were ITT World Communications Inc., TRT Telecommunications Corporation, Western Union International, Inc., RCA Global Communications, Inc., and FTC Communications, Inc. *See Western Union Telegraph Co.,* 102 F.C.C.2d 485, 486 n. 2 (1985) ("*Reimbursement Order*"), J.A. at 304.

the time in dispute in this case.[3] Section 222(e)(1) provided for the division of charges following the consolidation or merger of telegraph carriers. Under this subsection, divisions between the ICPs and WU were to be determined by agreement between the parties, subject to FCC approval, or, failing that, by FCC prescription following notice and hearing. Section 222(e)(3) governed review of extant or proposed rates and allowed rate prescription by the Commission. Both provisions are set out in the margin.[4] As we shall presently see, it is the application of section 222 to the division of revenues for outbound Telex/TWX calls that provides the centerpiece of the present controversy.

With these various provisions in mind, we turn to the earlier-promised narrative, which, alas, will win no awards for brevity.

### B

It was a generation ago, back in 1961, when WU first entered into contracts with the ICPs. It was at that time, in the first year of the Kennedy Administration, that WU first began offering domestic Telex service. Under these contracts, WU charged the ICPs the same rates for interconnection with its domestic Telex network that it charged the general public. In 1971, WU expanded its horizons, acquiring the TWX network from AT & T. The upshot was a new dimension to the WU–ICP relationship, as the former assumed AT & T's contracts with the latter. Unlike the Telex agreements, however, the TWX contracts provided for a 27 percent discount off AT & T's public rates. When the TWX contracts expired in 1973, WU and the ICPs engaged in a series of confrontations that set the stage for the present dispute.

Here is what happened. WU informed the ICPs that it would continue to provide TWX services to them only at the rates it charged regular domestic subscribers, just as it did for Telex services. Unenamored of the threatened termination of their longstanding discount, the ICPs refused to pay WU's public rate, claiming that WU had no right unilaterally to increase its share of the international charges. Instead, the ICPs continued to pay a discounted rate for the interconnections. Displeased by the ICPs' tack, WU filed suit in New York

3. In 1981, Congress passed the Record Carrier Competition Act, which replaced section 222 of the Communications Act of 1934 in its entirety, including its division-of-charges provisions. 47 U.S.C. § 222 (1982). The Act authorized WU to enter the international markets that had theretofore been closed to it. By ending the division of the global market between WU and the ICPs, the Act was designed to "permit full and vigorous competition in both the international and domestic record communications markets without the constraints imposed by an artificial division of the market." H.R.Rep. No. 356, 97th Cong., 1st Sess. 4 (1981), 1981 U.S.Code Cong. & Admin.News 2730. *See generally Western Union Telegraph Co. v. FCC,* 729 F.2d 811 (D.C.Cir. 1984) (first major challenge to FCC orders implementing the Act).

4. Section 222(e)(1) provides:
In the case of any consolidation or merger of telegraph carriers pursuant to this section, the consolidated or merged carrier shall, except as provided in paragraph (2) of this subsection, distribute among the international telegraph carriers, telegraph traffic by wire or radio destined to points without the continental United States, and divide the charges for such traffic, in accordance with such just, reasonable, and equitable formula in the public interest as the interested carriers shall agree upon and the Commission shall approve: *Provided however,* That in case the interested carriers should fail to agree upon a formula which the Commission approves as above provided, the Commission, after due notice and hearing, shall prescribe in its order approving and authorizing the proposed consolidation or merger a formula which it finds will be just, reasonable, equitable, and in the public interest, will be, so far as is consistent with the public interest, in accordance with the existing contractual rights of the carriers, and will effectuate the purposes of this subsection.

Section 222(e)(3) provides:
Whenever, upon a complaint or upon its own initiative, and after a full hearing, the Commission finds that any such distribution of telegraph traffic among telegraph carriers, or any such division of charges for such traffic, which is being made or which is proposed to be made, is or will be unjust, unreasonable, or inequitable, or not in the public interest, the Commission shall by order prescribe the distribution of such telegraph traffic, or the division of charges therefor, which will be just, reasonable, equitable, and in the public interest, and will be, so far as is consistent with the public interest, in accordance with the existing contractual rights of the carriers.

State court to compel payment of the deficiency.[5] Eventually, however, the dispute was resolved through agreements reached with individual ICPs during 1975 and 1976.

These settlement agreements went beyond resolving the TWX payment dispute to encompass rate arrangements for Telex service as well. The settlements provided, in brief, that WU would provide both its Telex and TWX services to the ICPs at a discount of approximately 5½ percent below public rates. These agreements, at least as to the rates, were to remain in effect until December 31, 1977.

### C

In anticipation of the expiration of the 1975–76 settlement agreements, WU filed revisions to its domestic tariff on December 1, 1977, increasing public Telex/TWX rates. The next day, WU filed a tariff setting rates for both inbound and outbound Telex/TWX services provided to the ICPs. These rates were equal to WU's proposed public rates.[6] As to the proposed public rates, governed by sections 201–205 of the Communications Act, see supra p. 4, the Commission suspended the tariffs and set them for investigation. See Western Union Telegraph Co., 67 F.C.C.2d 1420 (1978), J.A. at 1.

As to WU's proposed interconnection charges, the ICPs registered their opposition to the new tariffs with the FCC, just as they had resisted attempts to raise interconnection rates four years before. The ICPs claimed that, under section 222(e) of the Communications Act (which we previously described), WU was prohibited from unilaterally raising rates. The ICPs further argued that the division of charges could only be accomplished by (1) agreement between the ICPs and WU (and approved by the FCC) or (2) prescription by the Commission. Accordingly, the ICPs re-quested the FCC to reject the tariffs outright; in the alternative, they urged that the tariffs be suspended and investigated.

As to WU's proposed tariff for *outbound* services, the FCC found that the division of charges had to be made consistently with section 222(e) and that WU's unilateral action in setting rates was inconsistent with that provision. The FCC therefore rejected WU's tariff for outbound service. The Commission interpreted the pivotal statutory language in the following manner:

> Section 222(e)(1) places an affirmative requirement upon WU and the [ICPs] to attempt to agree on a reasonable division of charges formula for outbound overseas traffic. In the event WU and the [ICPs] are unable to agree on a reasonable formula, which the Commission approves, or an existing division of charges is found after hearing to be unreasonable, the Commission must, by reason of Section 222(e)(1) prescribe a division of charges which will be just, reasonable, equitable, and in the public interest.

*Designation Order*, 68 F.C.C.2d at 113, ¶ 42, J.A. at 24.

As to *inbound* services, however, the FCC found that section 222(e) was inapplicable; rather, sections 201–205 of the Communications Act, which as we indicated above constitute the ordinary tariff mechanism (providing for carrier-initiated rates), controlled the charges for those services. Acting under those provisions, the FCC suspended WU's inbound tariff for the full statutory period of five months, imposed an accounting order, and added that filing to the already pending investigation of WU's public rates. *Id.* at 119–24, ¶¶ 56–76, J.A. at 30–35.

Five months later, on August 10, 1978, WU's tariffs for *inbound* ICP Telex/TWX service became effective, and the ICPs became obligated to pay the full public rate.

---

**5.** The Supreme Court of New York ruled that the Commission had primary jurisdiction to resolve the controversy. *See Western Union Telegraph Co.*, 68 F.C.C.2d 98, 100–01, ¶ 5 (1978), *reconsideration denied*, 69 F.C.C.2d 924, *petition for review dismissed sub nom. Western Union Int'l v. FCC*, 652 F.2d 136 (D.C.Cir.1980) ("*Designation Order*"), J.A. at 11–12.

**6.** The tariffs setting the public and ICP rates were to become effective March 1, 1978 and March 24, 1978, respectively. WU later deferred the effective dates of each to March 10, 1978 and May 10, 1978. *Reimbursement Order* 102 F.C.C.2d at 487, ¶ 4, J.A. at 305.

By virtue of the accounting order, however, WU remained subject to a Commission-mandated future readjustment in the event the FCC's investigation concluded that the ICPs were entitled to a discount. The rate for *outbound* ICP Telex/TWX service remained unsettled, however, pending resolution under the separate mechanism provided by section 222(e). It is the uncertainty over the proper rate to be charged during this unsettled—or hiatus—period that provides the basis for the current controversy.

Both the ICPs and WU sought review of the FCC's orders.[7] During the pendency of their petitions, the parties continued their settlement negotiations, eventually finding common ground in January 1979. Under the settlement, the parties' agreements would control rates for a two-year period—one year in either direction from the settlement date—from January 1, 1978 through December 31, 1979. Regaining their discount (at least in part), the ICPs were to pay for WU's interconnection services at a rate of 6 percent off the public tariff rate, including the retrospective adjustment.[8]

The resolution was short-lived, however, as the Commission rejected the settlement agreements only four months after their announcement. *Western Union Telegraph Co.*, 71 F.C.C.2d 621 (1979) (*"Rejection Order"*), J.A. at 60, *petition for review dismissed sub nom. Western Union Int'l v. FCC*, No. 79–1632 (D.C.Cir. Sept. 10, 1979). In doing so, the Commission was "concerned that the rate schedules contained in the Agreements unduly favor the [ICPs] *vis a vis* WU's public domestic users of the same Telex and TWX services." *Id.* at 628, ¶ 14, J.A. at 67. The Commission reasoned that "there does not appear to be any justification ... for significantly different rate treatment for" the ICPs and public domestic customers. *Id.* at 629, ¶ 16, J.A. at 68. The Commission also expressed concern that the settlements called for rates to be

set in absolute numerical terms rather than tied directly to public tariff rates. *See supra* n. 8. This, the Commission feared, would only exacerbate the fractious "dispute-by-dispute" approach of the ICPs and WU to resolving their differences. The FCC further opined that "the parties' historical inability to agree on divisions of charges might jeopardize the provision of service to the public." *Id.* at 629, ¶ 17, J.A. at 68. It therefore concluded that the "public interest would best be served by Commission prescription of lawful charges for [ICP] use of WU's domestic Telex/TWX networks." *Id.* at 630, ¶ 17, J.A. at 69.

The FCC also rejected the ICPs' assertion that the settlement agreements constituted the only means by which to settle rates for the preceding year. The Commission addressed the argument in the following way, which we take the liberty of quoting at length because it sets forth the FCC's interpretation of section 222(e) to which it was steadfastly to adhere throughout this litigation:

> In support of the Agreements, which impute the settlement rates back through 1978 when charges were uncertain, the [ICPs] assert that the Commission does not have the authority to prescribe charges on a retroactive basis, *i.e.*, back to the time when any prior agreements may have expired and no other agreements were in effect. Thus, the parties view the Agreements as the sole means of ascertaining applicable inbound charges for the period January 1, 1978 to August 10, 1978 and outbound charges from January 1, 1978 to the present time. Contrary to these views, we believe we have ample regulatory authority in appropriate cases to frame a remedy which will afford a party relief for a past period in which it was inequitably or unlawfully

---

7. The ICPs sought review of the FCC's decision not to reject WU's inbound rates; for its part, WU sought review of the decision to reject its outbound rates. This court dismissed both petitions as premature. *Western Union Int'l v. FCC, supra*, 652 F.2d at 136.

8. The actual charges were to be calculated at 6 percent off the public rates for which WU filed tariffs on December 2, 1977. These were to become effective on August 10, 1978. *Rejection Order*, 71 F.C.C.2d at 623, ¶ 4, J.A. at 62. The rates would not reflect further increases scheduled to take place on October 1, 1978. *Id.* at 629, ¶ 17, J.A. at 68.

treated. Furthermore, in our opinion Section 222(e) implicitly empowers the Commission to determine a proper outbound division of charges for periods during which the parties were unable to reach an acceptable agreement. Absent this power, where carriers fail to agree, there would be no remedy during the hiatus period prior to Commission prescription. The failure of the Commission to act in a situation such as this could lead to basic unfairness and possibly, even the cessation of service in extreme cases, an outcome hardly envisioned by Congress. This is not a case where Commission determined charges would supersede a contract rate or tariff rate applicable at the time the service was provided. The fact is that no rates were in effect during the periods in question. We believe that in this unique circumstance we may decide upon reasonable charges for application during these periods, provided the carriers ultimately are unable to reach an acceptable resolution of their differences.

*Id.* at 630, ¶ 18, J.A. at 69 (footnote omitted).

The Commission concluded by "urg[ing] the parties to attempt to arrive at a mutually acceptable interim arrangement." *Id.* at 630, ¶ 19, J.A. at 69. It warned that in the event agreement was not forthcoming, the Commission was "prepared to prescribe interim charges ... if necessary or to otherwise fashion an appropriate remedy for this interim period." *Id.* The Commission authorized the ALJ to prescribe an interim division of charges for outbound ICP traffic upon application by any party or on the ALJ's own initiative. *Id.* at 630 n. 14, J.A. at 69.

In July 1979, the ALJ prescribed an interim division of charges that required the ICPs to pay WU the same rates as those paid by the general public. *Western Un-*

*ion Telegraph Co.,* FCC 79M–845 (July 24, 1979), (*"Interim Prescription Order"*), J.A. at 98.[9] From that point on, the ICPs duly paid the public rate for both inbound and outbound traffic.

While the interim prescription ended immediate uncertainty over rates, it left unsettled the proper rates for the period during which the proper division of revenues between the parties was uncertain. As to *inbound* rates, governed by the conventional ratemaking principles embodied in sections 201–205, there were no rates in effect between the time the settlement agreements expired and the date the WU inbound tariff went into effect (1/1/78 to 8/10/78). As to *outbound* rates, controlled by section 222, there were no rates in effect between the time the settlement agreements expired and the date of the interim prescription (1/1/78 to 7/24/79). WU's protests to the contrary notwithstanding, the ICPs continued during this interim period to pay the rates established for Telex/TWX service in the 1975–1976 settlement agreements (which had expired on December 31, 1977). This amounted to a 5.5 percent discount off the public rates in effect at that time.[10]

After the interim prescription, the ALJ continued his investigation of WU's rates, encompassing both public rates and revenue divisions with the ICPs. In March 1982, a second ALJ issued a decision concluding that WU's *public rates* were unreasonable and discriminatory. He also found that, as compared to its provision of service to the public, WU enjoyed "a significant cost difference" in furnishing interconnections to the ICPs. *Western Union Telegraph Co.,* 95 F.C.C.2d 922, 943, ¶ 86 (1982), (*"Initial Decision"*), J.A. at 176. The ALJ determined that the cost savings justified giving the ICPs a discount of 25 percent off public rates. Accordingly, the ALJ ordered WU to refund approximately

---

**9.** The Commission refused to review the *Interim Prescription Order* on the ground that it was interlocutory. *Western Union Telegraph Co.,* FCC 79–812 (Dec. 13, 1979), J.A. at 111, *petition for review dismissed sub nom. TRT Telecommunications Corp. v. FCC,* No. 79–2524 (D.C.Cir., Dec. 19, 1980).

**10.** FTC Communications, Inc. apparently paid the full tariff rates at which WU billed. *See Reimbursement Order,* 102 F.C.C.2d at 490, ¶ 11, J.A. at 308.

$75 million, plus interest, to the ICPs. *Initial Decision,* 95 F.C.C.2d at 952, ¶ 119, J.A. at 185. This represented the difference between what the ICPs had paid WU and a 25 percent discount for the period beginning January 1, 1978 (the start of the hiatus period). Brief for FCC at 13; Brief for Petitioners at 11.

But the ICPs' victory proved to be ill-fated. The Commission reversed the ALJ's findings, concluding that WU's rates were lawful and that the ICPs were not entitled to *any* discount. *Western Union Telegraph Co.,* 95 F.C.C.2d 881 (1983) *("Final Decision "),* J.A. at 251. The Commission accepted WU's argument that, even assuming some cost savings in serving the ICPs, "these [projected amounts] are well within the range of cost variances which [WU] encounters in serving its universe of 140,000 subscribers, and that differentials between various domestic calls can vary as much as 37 percent." *Final Decision,* 95 F.C.C.2d at 919, ¶ 92, J.A. at 289. The FCC reasoned that "[w]ithin the process of carrier-initiated ratemaking, carriers are given considerable flexibility to average their costs among their subscriber base." *Id.* at ¶ 93. Thus, in the Commission's view, "[t]he real issue ... [was] whether the degree of rate averaging practiced by [WU] was reasonable." *Id.* at ¶ 94. The Commission concluded that it was: "The record here shows that the cost differences associated with providing service to the [ICPs] and public were minor, and do not, standing alone, warrant a finding of unreasonableness and mandatory rate deaveraging." *Id.* at ¶ 94.

The ICPs sought review of both the *Final Decision* and the *Interim Prescription Order* of July 1979. *See supra* n. 9. The Second Circuit subsequently denied the petition for review. *FTC Communications, Inc. v. FCC,* 750 F.2d 226 (2d Cir.1984). In reviewing the *Final Decision,* the Second Circuit found "substantial evidence to support the Commission's conclusion that WU's public rates were reasonable and that the [ICPs] are not entitled to a dis-

count," and that "the Commission did not abuse its discretion." 750 F.2d at 230 n. 5.[11] As to the *Interim Prescription Order,* the court found that, although section 222(e) by its terms did not confer the requisite authority, the Commission nonetheless possessed adequate authority under the "necessary and proper" clause of the Communications Act, section 4(i), 47 U.S.C. § 154(i). That provision authorizes the FCC to "issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." The court found the FCC's interim prescription both consistent with the statutory scheme and necessary for the FCC effectively to carry out its statutory mandate. The court considered *AT & T v. FCC,* 487 F.2d 865 (2d Cir.1973) *("AT & T II "),* a case featured by the ICPs, entirely inapposite. That case involved a challenge to an FCC requirement that AT & T obtain the Commission's "special permission" before filing a new tariff. As the Second Circuit characterized its holding in that earlier case, "[w]e found the special permission procedure to be unauthorized by and *inconsistent* with the statutory scheme of carrier initiated rates." 750 F.2d at 232 (emphasis in original). Because the FCC relied on section 222(e), rather than the conventional ratemaking provisions, the court concluded that no such inconsistency existed.

The court also found the Commission's action "necessary" within the meaning of section 4(i):

> The Commission's use of its section 4(i) power in this situation and in this manner was both helpful and necessary to the execution of its function. If it were otherwise, the [ICPs] would have every incentive to refuse to negotiate with WU and to delay the resolution of the rate-making process for as long as possible in order to keep the benefits of the lower, expired contract rates. Therefore, we hold that under section 4(i) the Commission had authority to establish an interim rate until a final rate could be prescribed.

---

**11.** The court also rejected the ICPs' argument that the FCC failed adequately to articulate the statutorily required findings. 750 F.2d at 231.

750 F.2d at 232.[12]

### D

With this rather extensive (if indeed not exhausting) background, we come at long last to the FCC's orders that are the object of this petition for review. Thirty days after the FCC issued its *Final Decision* (and over a year before the Second Circuit issued its opinion affirming it), WU filed a petition for reconsideration or clarification requesting that the Commission order the ICPs to pay WU for the difference between the public rates that had been in effect during the "rate hiatus" period and the discounted rates that the ICPs actually paid. *See* Petition for Reconsideration/Clarification, J.A. at 292.

The Commission granted WU's petition, but as to *outbound* rates only, in August 1985, about eight months after the Second Circuit affirmed the Commission's *Final Decision* and *Interim Prescription Order. Reimbursement Order,* 102 F.C.C.2d 485 (1985), J.A. at 303.[13] The FCC first observed that "[u]nder Section 222(e) the outbound rates could only be set by carrier agreement or Commission prescription." *Reimbursement Order,* 102 F.C.C.2d at 496, ¶ 27, J.A. at 314. Since "[n]either existed from January 1978 to August 1979," the Commission reasoned, "full resolution of this matter requires that we set rates for this period, when no rates were in effect." *Id.* The Commission concluded that, "in accord with [its] determinations in the *Final Decision* ... WU was entitled to recover the full public rate for outbound Telex/TWX services from the [ICPs] for this period." *Id.* The Commission believed that it had statutory authority for its order under sections 222(e) and 4(i) of the Act. It concluded that " 'we have ample authority to frame a remedy which will afford a party relief for a past period in which it was inequitably or unlawfully treated.' " *Id.* at 497, ¶ 29, J.A. at 315 (quoting *Rejec-*

*tion Order,* 71 F.C.C.2d at 630, ¶ 18, J.A. at 69).

As to inbound rates, however, the Commission denied WU's request because "[t]hese rates were governed by normal carrier initiated filing procedures." *Id.* at ¶ 28 Under those procedures, "it was within WU's power ... to establish these rates." *Id.* Thus, the Commission concluded, WU was not, at this late date, "entitled to recover additional payments for inbound service." *Id.*

### II

The ICPs mount a several-pronged attack on the Commission's decision to permit WU to recover the full public rate for its outbound interconnection services during the hiatus period. The ICPs argue, *first,* that the Commission lacked statutory authority, and acted inconsistently with its own precedent, to effect this "retroactive adjustment"; *second,* that WU's recovery is barred on procedural grounds; *third,* that the Commission erred in adding interest to the rate differential; and *fourth,* that, even if the Commission enjoyed statutory authority for its reimbursement order, the Commission acted unreasonably in requiring reimbursement under the particular circumstances of this case. We assess each argument in turn.

### A

As the ICPs see it, the Commission was without power under the Communications Act to award WU what they characterize as a "retroactive rate increase." Brief for Petitioners at 23. They emphasize that section 222 by its terms does not confer authority on the Commission to order such reimbursement. Moreover, they maintain, the "necessary and proper" clause of the Communications Act cannot fill the gap, inasmuch as the FCC's action is neither consistent with the statutory scheme nor necessary to its execution. Finally, peti-

---

**12.** The court also relied upon our decision in *Lincoln Telephone & Telegraph Co. v. FCC,* 659 F.2d 1092 (D.C.Cir.1981), which upheld the FCC's authority, under section 4(i), to establish an interim billing and collection arrangement.

**13.** It is this order, along with the FCC's order rejecting reconsideration of it, *Reconsideration Order,* J.A. at 327, that the ICPs challenge in the present proceedings.

tioners argue, the Commission's order is inconsistent with its only other decision bearing on this issue.

### 1

The Commission recognizes that section 222(e) "does not explicitly address the question of the agency's authority to deal with a gap or 'hiatus' in the divisions process." Brief for FCC at 28. Although conceding that section 222(e) "does not explicitly state that the Commission may set divisions formulas with retrospective effect," *id.* at 31, the Commission emphasizes that that provision "does not forbid such action." *Id.*

We agree that the express terms of section 222(e), viewed in isolation, fail to yield an answer. In so concluding, we need not tarry long over the ICPs' argument that by using the term "prescribe," Congress prohibited the FCC from ordering the sort of retrospective division of charges at issue here. The ICPs emphasize that the pivotal statutory term, deriving from the Latin *praescribere*, "to write at the beginning," and thus in English, "to lay down as a guide, direction, rule" contemplates prospective action only. Brief for Petitioners at 23. While edified by the ICPs' exegesis, we nonetheless find ourselves unable to accord significant weight to the ancient Romans' understanding of the term with which a decidedly modern-day Congress chose to legislate in the here and now. As the FCC points out, "prescribe" has come to have other meanings, including "to lay down authoritatively as a guide, direction, or rule of action; impose as a peremptory order: dictate, direct, ordain." *Webster's Third New International Dictionary,* 1792 (1981). Brief for FCC at 30 n. 29. And while the term "rule" may have prospective implications, *see* Reply Brief at 3, it is, after all, a *formula (or rule) for division of charges* that the statute re-

quires the Commission to order. We see nothing in the term "prescribe" that precludes the laying down of a formula with retrospective effect. The term simply will not bear the weight petitioners give it.[14]

### 2

Failing to find an answer to our interpretive inquiry in the word "prescribe," we look more broadly to the overall statutory scheme that Congress erected. *See United States v. Fausto,* — U.S. —, 108 S.Ct. 668, 671, 98 L.Ed.2d 830 (1988) (answer to interpretive inquiry to be found by looking to the entirety of the statutory text and structure that it establishes); *United Savings Association of Texas v. Timbers of Inwood Forest Associates,* — U.S. —, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) ("[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme"). The Commission argues that its "authority to produce retroactive relief is implicit" in the express provisions of the statutory scheme, "which authorizes only two methods of producing effective rates." *Reconsideration Order,* slip op. at 5, ¶ 26, J.A. at 331.

We agree, upon reflection, that the authority to order reimbursement is implicit in the statutory scheme. That regime provides a mechanism for division of revenues between WU and the ICPs that differs strikingly from the conventional rate-making mechanism set forth in sections 201–205 of the Communications Act. The contrast in the two schemes highlights the different set of principles under which the Commission operates in administering section 222(e).

Under the conventional mechanism for initiating rate changes, Congress' concern was to protect the vast, diffuse number of individual ratepayers against the market power enjoyed by a common carrier, while

---

14. Petitioners' argument from the Administrative Procedure Act, as well as other ratemaking statutes, is similarly unavailing. The ICPs argue that the prospective understanding of "prescribe" is embodied in the APA, "which classifies ratemaking as a species of rulemaking and defines a 'rule' as an agency statement of 'future effect,' including 'prescription for the future of

rates.'" Brief for Petitioners at 24 (citing 5 U.S.C. § 551(4)). But it is the premise of that statement that is at issue in this case. As we demonstrate in the next section, the question is whether conventional ratemaking principles apply to section 222(e) to begin with. Our structural analysis of the statute leads us to answer that question in the negative.

at the same time protecting the interests of investors in the regulated entity. Thus, the statutory scheme provides the Commission with powerful supervisory authority over rates, while at the same time allowing the carrier a large measure of flexibility and predictability in controlling its rates. As we previously adumbrated, the statutory structure accomplishes the latter by allowing carriers to initiate rate changes. But tariffs must, of course, be filed with the FCC, and carriers are held to the terms of those tariffs that they choose to file. New tariffs go into effect when designated by the carrier, as long as the prescribed notice period is satisfied (or countervailing action is not taken by the FCC). In addition, the rule against retroactive ratemaking assures that a carrier may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle. *See City of Piqua v. FERC*, 610 F.2d 950 (D.C. Cir.1979).

On the other hand, the Commission can suspend rates for up to five months. Thereafter, unless it has found the rates unlawful, the commission must permit the rates to take effect, but even then, the Commission may impose an accounting order and provide for a refund if the rates are ultimately found unlawful. Thus, the Commission, in accord with its conception of the public interest and its statutory mandate, need not approve *any* increase in carrier-filed rates.

Section 222(e), as we indicated earlier, provides a very different mechanism for addressing the specific issue of *dividing revenues*. In the § 222(e) setting, Congress obviously did not have occasion to concern itself with protecting a large, diffuse number of ratepayers from a common carrier's market power. Instead, Congress could (and did) leave it to the ICPs to work out an agreement with WU, with supervision by the Commission in the event of stalemate (and to assure that any agreements did not work harm to third parties). In short, the ICPs, Congress believed,

could fend for themselves, a belief that appears to have been fully borne out by the events of this case. Although the ICPs obviously needed WU to complete international calls to or from the United States, WU likewise needed the ICPs to partake of the international market.[15] Agreement between the parties, not carrier-initiated ratemaking, is thus the keystone of the mechanism that Congress ordained to control the parties' relationship.

Under this statutory scheme, then, WU cannot unilaterally effect rate changes—a point no longer at issue at this stage of the litigation. Rather, the statute places the ICPs and WU, statutorily at least, on equal footing. The statute, in effect, lets them slug it out to agreement. The FCC's role in the contest is to act as umpire, both to see that the fight is fair and to assure that it does not, as it were, spill out into the crowd. It is the latter role that the FCC played in rejecting the parties' settlement agreements at an earlier stage of this case, and the former that it carried out in determining a rate to apply for interconnections between the parties during the hiatus period when *no rates were in effect*.

Absent injury to the public interest, however, the statute plainly evidences a preference for agreement on rates between WU and the ICPs. In the event no agreement is reached, the FCC is then vested with authority, in effect, to "arbitrate" the parties' dispute. That authority derives from the Commission's overall authority to effect a full disposition of the claims between the parties, *see* 47 U.S.C. § 222(e)(3).

Were the FCC to lack such authority there would be no mechanism for filling a gap in the division of charges for the period when no agreement was in effect. As we have already observed, WU may not unilaterally effect a rate change. Conversely, we do not believe that Congress reasonably would have desired that expired rates, fixed by agreement, inexorably continue in effect. A definite expiration date

---

**15.** Congress enacted the original version of section 222 governing the relationship between WU and the ICPs in 1943. This provision enabled WU to merge with the Postal Telegraph Company, thereby creating a domestic telegraph monopoly. Brief for Petitioners at 4; Brief for FCC at 7 n. 7.

is (at least presumably) part of the bargained-for consideration between the parties. As the Commission points out, if expired rates remained in effect until replaced either by a new agreement or by Commission prescription, then "the ICPs could unilaterally extend the favorable contract rates beyond the term of the agreement merely by taking an intransigent negotiating position with Western Union." Brief for FCC at 29. Such a strange and gap-ridden scheme, we are persuaded, Congress could not reasonably have intended. To the extent that the statutory scheme allows a standoff to occur, it stands to reason that it implies (in the absence of an express prohibition) a means for the FCC fully to resolve it.

Finally, to the extent that the FCC has authority to approve *agreements* that include provisions for setting the division of charges retrospectively, as past agreements have done, it is at least consistent to conclude that the FCC also has authority to *prescribe* divisions with retrospective effect. It would be an odd (not to mention unworkable) statutory scheme indeed that allowed the FCC to approve such divisions and yet prohibited it from prescribing them when agreement fails.

### 3

Petitioners argue, however, that implying such authority in the Commission is inconsistent with other provisions of the Communications Act, and thus cannot be approved under the "necessary and proper" provision of section 4(i). The principal attack in this respect is that the Commission's presumed authority to prescribe a division of revenues with retrospective effect is inconsistent with the well-established rule against retroactive rate adjustment. *See* Brief for Petitioners at 31. That venerable rule works in tandem with the similarly well-established "filed rate

doctrine" providing that only rates on file can be given effect. As the ICPs point out, these doctrines assure that "a carrier's customers [will] be able to plan their activities and make business decisions on the assumption that the rates they pay the carrier will not be retroactively increased." *Id.* (citing *Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135, 1140–41 (D.C.Cir. 1987) *reh'g denied*, 844 F.2d 879 (1988).

■ But, as petitioners candidly recognize a mere two pages later in their brief, the rule against retroactive rate increases is one that emerges from sections 201–205 of the Communications Act, *see* Brief for Petitioners at 33; *see also* Reply Brief at 5, and similar provisions in ratemaking schemes providing for carrier-initiated rates. This prohibition has no application to section 222(e). Unlike the Act's ratemaking provisions, section 222(e) sets forth as the preferred basis for determining the division of revenues an *agreement* between WU and the ICPs. It is the requirement of a meeting of the minds that protects both the ICPs and WU, inasmuch as neither can effect a new division of charges—either retrospectively or prospectively—without the other's acquiescence.[16]

### 4

The ICPs next argue that the Commission's reimbursement order was not "necessary" within the meaning of section 4(i). First, the ICPs contend that WU could have sought an interim prescription order from the FCC, avoiding any rate hiatus. In the ICPs' words, "[t]hat Western Union did not seek more expeditious action hardly establishes that Section 222 itself created a hiatus, nor does its delay necessitate the 'drastic and unusual' retroactive payment order decreed by the FCC." Brief for Petitioners at 42–43. Even without an interim prescription order, the ICPs argue, WU in

16. The ICPs' response to all this is that, although the FCC relied on section 222(e) for its authority to order a division of charges with retrospective effect, in actually calculating that division, "[t]he FCC manifestly did not rely on division-of-revenues principles to reach this result." Reply Brief at 6. Rather, the ICPs claim, the FCC treated them as ordinary customers, invoking ratemaking principles developed under sections 201–205. This argument, on analysis, goes to the *reasonableness* of the Commission's treatment of the ICPs under section 222(e) rather than to the Commission's *authority* to order a retrospective division of charges in the first instance. We deal with this argument in that context in Part D below.

1977 could have "sought an order prescribing new rates to be effective upon the expiration of its contract with the ICPs at the end of that year." *Id.* at 43.

■ The point is not without force. But, upon reflection, we are unable to agree that the FCC is powerless under these circumstances. The FCC's authority to prescribe interim rates, approved by the Second Circuit, does not dilute its need for the authority it seeks to assert here. Interim prescription and retrospective division of revenues are, obviously, different tools. Even if WU had sought an interim prescription order at the outset of this controversy (or a final order before it even started), as we now know with the benefit of hindsight that it could have, there is "no assurance that the Commission could have acted quickly enough to prevent a rate gap from occurring." Brief for FCC at 36.[17] Indeed, it seems inevitable, in view of the practical realities of any bureaucratic process, that some gap was inevitable.

The authority to effect the sort of retrospective division of charges that the Commission ordered here was, we believe, both necessary and helpful in the exercise of the Commission's supervisory authority under section 222(e). In no other manner could the Commission have fully discharged its duty to effect a complete division of the revenues between the parties for the period when no agreement was in place.[18]

5

As its final volley against the Commission's statutory authority, the ICPs maintain that the FCC's interpretation of section 222(e) is inconsistent with its only other decision in this area, an opinion handed

down a generation ago. That decision, *Tropical Radio Telegraph Co.,* 17 F.C.C. 645 (1953), involved a complaint by a predecessor company (Tropical) to one of the present day ICPs that WU's schedule of charges for marine telegraph services was "unreasonably and unjustly discriminatory against Tropical and in favor of other ... carriers in violation of ... Section 222(e)" and in violation of the formula for divisions that the Commission had prescribed pursuant to section 222(e)(1). *Id.* at 646, ¶ 2. Specifically, the dispute in *Tropical* was over how the general formula prescribed by the FCC should be applied to ship-to-shore and shore-to-ship telegraphic traffic. Tropical requested the Commission to prescribe a formula specifically addressing these rates and sought restitution for losses which it claimed had been caused by the allegedly discriminatory rates of the prior five years. *Id.* In its Initial Decision in the case, the Commission held that under the division arrangements that WU then had in place, WU "received, collected or retained more from Tropical than from certain other marine carriers." *Id.* at 647, ¶ 7. Accordingly, the Commission "prescribed the manner in which charges for such traffic were to be divided in the future and amended the 'Formula' for divisions already in place." *Id.*

Some seven months later, the Commission ruled on Tropical's still-pending claim for restitution. At the outset, the Commission observed that its "Formula" was silent as to the proper division of charges and that the parties themselves had not reach agreement. Thus, as the FCC saw it, prior to the *Tropical* proceedings, the Commission "had not approved a specific method

---

**17.** Of course, the ICPs as well could have, but did not, seek a final or interim prescription order.

**18.** The ICPs also argue that the relief ordered by the FCC was "unnecessary" because a straightforward application of the "filed rate doctrine" would have eliminated the need for such extraordinary relief. *See* Brief for Petitioners at 44–45. As the ICPs put it, "a more natural interpretation [of section 222] is that prior rates remain in effect until changed by later agreements or by subsequent FCC prescription." Reply Brief at 10. But, as we have already sug-

gested, section 222 inevitably—if inadvertently —left a gap in the statutory scheme—a gap that neither the expired rates preferred by the ICPs nor the public rates that WU attempted unilaterally to file could have filled. There is, moreover, nothing in the terms of section 222 itself that suggests a Congressional preference for one method of filling the gap over another. And, as should by now be apparent, the filed rate doctrine, developed within the very different mechanism of sections 201–205 ratemaking principles, has no application here.

for dividing charges on marine telegraph traffic which had been agreed to by the interested carriers, nor had it prescribed a specific method which the carriers were required to follow in dividing tolls." *Id.* at 649, ¶ 11. Without an applicable formula, the Commission concluded that it was without power to grant Tropical restitutionary relief. The FCC reasoned as follows:

> The power to approve or to prescribe divisions under Section 222(e) is a power addressed to divisions to be observed for the future. Section 222(e) does not give the Commission authority to make retroactive adjustments of divisions covering periods prior to the prescription or approval of a specific method for dividing charges. The United States Supreme Court has stated that the power to require readjustments of divisions for the past is drastic and has indicated that such power would not be presumed to lie in a regulatory commission unless the power was conferred in very plain words. *Brimstone R. & Canal Co. v. U.S.,* 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928); *see also U.S. v. B. & O. R. Co.,* 284 U.S. 195, 52 S.Ct. 109, 76 L.Ed. 243 (1931).

The ICPs argue, with understandable vigor, that the FCC's action here conflicts with its decision in *Tropical.* They further argue that *Tropical* is entitled to a high degree of deference by virtue of its being rendered within the first decade of section 222's enactment. *See* Brief for Petitioners at 26 n. 18.

The ICPs have drawn blood. The Commission's counsel candidly acknowledged at oral argument that *Tropical* was not "at its fingertips" when the FCC first considered WU's petition for reimbursement. Indeed, the case had not even been cited to the Commission by the parties (especially the ICPs).

When the decision was at long last brought to the Commission's attention (in the ICPs' petition for reconsideration), the FCC responded in two ways. The Commission observed that its *Reimbursement Order* was "not inconsistent with the statement in *Tropical* that Section 222(e) does not specifically empower [the] Commission to make retroactive adjustments in divisions." *Reconsideration Order,* slip op. at 6, ¶ 31, J.A. at 332. But the FCC went on expressly to overrule *Tropical* to the extent it was inconsistent with the *Reimbursement Order. Id.* at ¶ 32.

The Commission advanced several reasons for considering itself at liberty to depart from *Tropical.* First, the Commission suggested that the Supreme Court cases relied upon in *Tropical* were, upon analysis, inapposite. Both cases, the FCC observed, involved a challenge to retroactive adjustment of rates that had been set by *agreement*—a far different situation from the case before it now in which agreed-upon rates had expired and *no* rates were in effect during the period in dispute.[19] Indeed, in *Tropical* itself the parties had operated for five years on the basis of a schedule that had theretofore stood unchallenged. Second, the Commission faulted *Tropical*'s inattention to (and, indeed, apparent ignorance of) the Commission's powers under section 4(i). Third, and relatedly, the FCC reasoned that *Tropical*'s narrow view of the Commission's powers had been undermined by subsequent cases broadly construing the Commission's powers under section 4(i). *See, e.g., GTE Sprint Communications Corp. v. FCC,* 733 F.2d 966 (D.C.Cir.1984); *Lincoln Tel. & Tel. Co. v. FCC,* 659 F.2d 1092 (D.C.Cir.1981). Finally, the FCC observed that there was no indication that any of the parties had relied to their detriment on *Tropical* and therefore no party would be harmed by the Commission's departure from it.

 In light of the foregoing explanation, we cannot agree with the ICPs' broadside that the Commission "failed to explain its radical change in statutory construction

---

19. *See Brimstone, supra,* 276 U.S. at 121, 48 S.Ct. at 286–87 ("we think the studied purpose [of the statute] was to grant no power to require readjustment of past receipts from *agreed joint rates*") (emphasis added); *B. & O. R. Co., supra,* 284 U.S. at 199, 52 S.Ct. at 109 ("where joint rates had been *agreed on* by the parties ... the statute confers no power to require adjustment for any period prior to final order") (emphasis added).

from the approach" adopted in *Tropical.* Brief for Petitioners at 25. To the contrary, the Commission thoroughly explained its approach to the rate hiatus here. When the ICPs finally brought *Tropical* to its attention, the FCC carefully distinguished the case. To the extent that the two decisions proved incompatible, the Commission's discussion of its powers under section 222(e), for reasons already surveyed, was grounded on a sound statutory and caselaw analysis reflecting a more considered approach than the modest one-paragraph analysis the Commission had devoted to the issue in *Tropical.* It is, of course, a commonplace that as long as it provides a reasoned explanation for its decision (and is not otherwise barred from switching horses in midstream), an agency is at liberty to depart from its longstanding interpretation of a statute. *See Chisholm v. FCC,* 538 F.2d 349, 364 (D.C.Cir.), *cert. denied,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976).

Finally, none of the parties to this proceeding relied to its detriment on *Tropical.* In fact, the parties were on notice at least since the Commission's *Rejection Order* in April 1979 that *in this case* the Commission was of the view that it was seized of ample authority to order a division of revenues with retrospective effect. *See supra* pp. 1541–42.[20]

**B**

The ICPs' second principal line of attack is that the Commission is procedurally barred from awarding the relief ordered here. They base their arguments on legal theories of waiver and estoppel; section 1.277 of the Commission's rules; and the statute of limitations set forth in section 415 of the Communications Act.

1

The ICPs argue that, by virtue of a number of earlier statements in this proceeding, WU disclaimed any right it might otherwise have had to seek reimbursement. *See* Brief for Petitioners at 48–55. In particular, the ICPs point to various statements by WU, made in the context of seeking relief from the Commission, to the effect that without such relief, WU might never recover lost revenues from the ICPs. Typical of the sort of statement that leads the ICPs to cry foul is one made by WU's counsel in June 1978 in a prehearing conference before the ALJ. There, WU argued that the ALJ ought to give priority to the issue of revenue divisions over the question of the lawfulness of WU's recently filed tariffs:

> [T]he divisions question is one that, when resolved, will be resolved only prospectively. That is, there is no provision for a retroactive adjustment of the divisions between Western Union and the international carriers, and if, as we believe, and as the Commission seems to believe, the international carriers ought to be paying the tariff rates, the longer it takes to establish that proposition the more Western Union loses and the more the international carriers are unjustly enriched. So that for that reason and because of the Commission's concern for the absence of any effective division arrangement, we think that that issue ought to take priority.

Transcript of Hearing Before ALJ Naumowicz, June 7, 1978, pp. 25–26, J.A. at 40–41 (quoted, in part, in Brief for Petitioners at 48–49).

In addition, the ICPs echo arguments advanced by the Commission (and joined by WU) before the Second Circuit that the

---

**20.** We reject the ICPs' argument that the FCC's approach to its powers under section 222—evidenced by its handling of *Tropical* and position before the Second Circuit (*see infra* pp. 1550–51)—constituted a series of repeated reversals in position that should strip the Commission of the judicial deference which would otherwise be due to it. *See* Brief for Petitioners at 60–62; Reply Brief at 24–25. Even if the conclusion followed from the premise—a broad issue on which we need not opine—we could not in conscience characterize the Commission's approach to its powers under section 222 as a series of "repeated reversals." As we have already pointed out, aside from its decision in *Tropical* over a quarter century earlier, the Commission has, at least since its *Rejection Order* in 1979, consistently maintained that it had authority to order reimbursement for the hiatus period.

Commission required authority for an interim prescription under section 222(e) because otherwise WU would have no way to recover underpayments.

■ The ICPs argue that these statements, among others, operated as a waiver of WU's right to claim reimbursement. We think not. WU's position from the outset of the hiatus period was that the ICPs should pay full public rates for its interconnection services; this position was backed up by specific action as WU eliminated the 5½ percent discount from the rates charged the ICPs throughout that period and filed tariffs reflecting its position that the ICPs should pay the full public rates. *See supra*, at 8, 10.[21] In the very passage just quoted, WU characterized the ICPs' partial withholding of those payments as "unjust enrichment"—hardly a signal that it was waiving the point. As to WU's (and the Commission's) position before the Second Circuit, this too can scarcely be deemed to constitute a waiver when WU had pending before the Commission its request for reimbursement at the very time the ICPs' petition for review was before the court in New York. *See supra* p. 1544.[22] Moreover, as we previously stated, we do not view the Commission's authority to order an interim prescription and its authority to order a division of charges with retrospective effect as redundant. In sum, we cannot in reason conclude that statements expressing concern over whether WU could ever recover withheld amounts somehow worked a waiver of its rights to do so.

2

■ The ICPs point again to the foregoing WU statements to support the different legal argument that WU is barred from seeking reimbursement on grounds of equitable estoppel. The ICPs maintain that had they known WU would seek retroactive payments, "the ICPs could have taken protective action to limit their liability, for example, by raising their rates to cover their increased costs." Brief for Petitioners at 56.

In light of what we have already said, the argument strikes a rather hollow chord. The ICPs were obviously aware that their agreements with WU had expired at the end of 1977 and that a new agreement would have to be negotiated with WU or resort had to a prescription by the FCC.[23] WU clearly put the ICPs on notice even before the contracts expired that it intended to charge the full public rate for interconnections. Had the ICPs wanted to assure that they would not be brought up short, they had ample opportunity to raise their rates at that time. Having been on notice from the outset that the rates to be charged after expiration of the agreements were a matter very much in controversy, the ICPs cannot satisfy the essential element of detrimental reliance.

3

Next, petitioners argue that WU waived any claim to retroactive relief by failing to take exception to the ALJ's *Initial Decision* in March 1982. The ICPs maintain that under section 1.277(a) of the Commission's rules, WU was required to state with *particularity* its claim for reimbursement,

---

**21.** Although WU billed the ICPs at the full public rates from January 1, 1978 to August 9, 1978 of the hiatus period (by eliminating the 5½ percent discount from the 1975–76 settlement agreement rate), subsequent increases in public tariffs filed by WU on August 10, 1978 and October 1, 1978 were not reflected in the billings. *See Settlement Rejection Order*, 71 F.C.C.2d at 628 n. 9, ¶ 14, J.A. at 67; Reply Brief at 13–14.

**22.** To the extent that the ICPs argue that they relied to their detriment on the Commission's

representations before the Second Circuit, the ICPs were obviously at liberty to point out the inconsistency, if such there was and they thought it relevant, to the Second Circuit.

**23.** In fact, the settlement agreement that the ICPs and WU did negotiate (and which was rejected by the Commission, *see supra* pp. 1541–42) provided for rates to be set retrospectively. This plainly shows that retrospective operation was a concept not entirely unknown to the ICPs.

or have its claim waived.[24] As the ICPs see it, "when [WU] filed exceptions to that decision, it should have raised every issue that it ultimately wanted the Commission to decide." Brief for Petitioners at 59. They assail the FCC's view that WU's general exceptions to the ALJ's action were sufficient to protect its rights as simply ignoring the Commission's own requirement of "particularity."

■ In our view, the Commission reasonably concluded that WU did not waive its rights by filing only general exceptions to the ALJ's *Initial Decision*. First of all, we are presented with a challenge going to the FCC's interpretation and administration of its own *procedural* rules. Needless to say, judicial deference is quite high in respect of such matters, as befits the orderly and appropriate relationship which should obtain between an independent agency and the courts. What is more, the requisite degree of particularity must, of course, be determined within the context of the decision rendered and the error claimed. In this instance, the ALJ had determined that the ICPs were entitled to a discount of 25 percent off the public tariff rates—well below what WU was billing or the ICPs were paying during the hiatus period.[25] In the face of a rather dramatic order requiring it to refund the ICPs some $75 million dollars, *see supra* p. 1542–43, we think the Commission could reasonably conclude that WU should not be faulted for failing to make a more specific claim for retrospective relief.

4

■ Finally, petitioners argue that WU's reimbursement claim is barred by the two-year limitation of actions embodied in section 415 of the Communications Act, which is set out in the margin.[26] The Commission's response is twofold: *first*, and most fundamentally, section 415 does not apply; and *second*, even if it does, WU's claims could not have "accrued" until the *Final Decision* was handed down setting the formula for division at full public rates. The Commission's first argument is, we believe, well-founded and thus dispositive.

The Commission makes the point this way:

Throughout Docket No. 78–97, it was understood by the parties that at the conclusion of the proceeding, the FCC would determine which, if either, claim was meritorious and would prescribe a divisions formula in accordance with its findings. The record shows that all of the parties, as well as the FCC (and this Court), acknowledged the conflicting claims and anticipated that adjustments for prior periods might be made upon establishment of a formula at the conclusion of the hearing.

Brief for FCC at 44 (footnote omitted).

Just so. As we have already pointed out, the proper division of charges between the ICPs and WU in the wake of their contracts' expiration was at issue from the beginning. No one—including the ICPs—could reasonably have harbored the slightest doubt as to the nature of WU's basic claim, namely that it ought to receive compensation for interconnection services at full public tariff rates.[27] Thus, WU's claim

---

24. Section 1.277(a) of the Commission's rules, 47 C.F.R. § 1.277(a), provides:
 (a) The consolidated supporting brief and exceptions to the initial decision (see § 1.276(a)(2)), including rulings upon motions or objections, shall point out with particularity alleged material errors in the decision or *ruling and shall contain specific references* to the page or pages of the transcript of hearing, exhibit or order if any on which the exception is based. Any objection not saved by exception filed pursuant to this section is waived.

25. For their part, the ICPs were protected by an accounting order that would have required WU to reimburse them for the entire amount of

"overcharge" during the rate hiatus. *See Designation Order*, 68 F.C.C.2d at 123–24 & n. 42, ¶ 71, J.A. at 34–35.

26. Section 415(a) provides:
 All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after.

27. Indeed, although we did not refer explicitly to the hiatus period, we did acknowledge the parties' conflicting claims with respect to the rates in effect prior to a final prescription by the FCC. *See supra* n. 7. We stated that WU would not be harmed by our disposition since

for what the ICPs characterize as "retroactive relief" was implicit in the issues to be included in the Commission's *Designation Order* of May 1978. That Order added the following issue to Docket No. 78–97:

> What formula for the division of charges for outbound [IPC]-interconnected Telex and TWX services should the Commission prescribe under Section 222(e) of the Act?

*Designation Order*, 68 F.C.C.2d at 124, ¶ 73, J.A. at 35. As our prior analysis has shown, in order for the Commission to effect a complete resolution of the issues, its prescription would properly include a settlement of the division of charges for the period in which no rates were in effect.

### C

Next, we address the ICPs' contention that the Commission erred in awarding interest to WU. In response to the ICPs' suggestion that the FCC should exercise its discretion by refusing to award interest, the Commission stated:

> In its Opposition, WU correctly cited our decision in *American Tel. & Tel. Co.*, 89 FCC2d 369 (1982), *affirmed sub nom. RCA Global Communications, Inc. v. FCC*, 717 F.2d 1429 (1983), for the proposition that it has been our practice to require interest at the IRS rate when ordering refunds. Interest traditionally has been considered necessary to restore the aggrieved party to the status quo ante, and we find that such relief is appropriate in the instant case.

*Reconsideration Order*, slip op. at 11, ¶ 59, J.A. at 337.

In its brief, the Commission expands on this skeletal statement, arguing that the award of interest was necessary to restore WU and the ICPs "to the positions they would have been in if an appropriate division of revenues had been in place during the hiatus period." Brief for FCC at 46. In light of its *Final Decision* that the ICPs should pay at full public rates, the ICPs' withholding of amounts during the hiatus period, in the Commission's view, amounted to "an unauthorized discount."

The ICPs respond that the Commission's approach is critically flawed in treating this as a refund case. We agree. As we have had more than one occasion to observe in our now-lengthy treatment of these issues, the Commission has considered the division of outbound-service charges under an entirely different mechanism than that provided under conventional ratemaking principles. Section 222, the Commission rightly argues, creates a regime as to which those conventional ratemaking principles are inapplicable. Yet, in assessing WU's claim for interest, the Commission has resorted in rather automatic fashion to refund principles applicable to conventional ratemaking schemes. Appealing to those principles, the Commission has determined that the award of interest follows, almost as night follows day, from what it characterizes as the ICPs' "unauthorized discount."

In our view, the FCC's rationale is in tension with its statutory authority for awarding interest. Providing interest in the conventional ratemaking setting is, of course, entirely consistent with the statutory scheme that those provisions erect. As the ICPs point out, interest on refunds in that setting "is necessary to protect a fundamental principle embodied in [sections 201–205]—*i.e.*, that carriers not charge more than a just and reasonable rate." Brief for Petitioners at 67. That a carrier is made subject to refunds, accompanied by liability for interest, is part of the price it pays for the flexibility in a scheme of carrier-initiated rates. The carrier retains the initiative to effect a rate increase, but it must account for its increased revenues if those rates are later found unlawful. It is for this reason that section 204 expressly authorizes the Commission to award interest when it orders refunds to customers.

These principles, like the rule against retroactive ratemaking and the filed rate doctrine, lack any necessary applicability to the very different statutory scheme created

---

WU "may also assert its claims for any restitutionary relief" after a final decision by the Commission. *Western Union Int'l v. FCC, supra*, 652 F.2d at 146 & n. 25.

in section 222(e). In particular, the concept of "unlawful" rates, which is the predicate for the FCC's argument that an award of interest is necessary to make WU whole, is largely (if not wholly) inapplicable to a division-of-revenues case.[28] And it is particularly incumbent upon the Commission more adequately to explain its reasoning in awarding interest where, as here, there has been no showing that WU failed to earn an adequate rate of return, or that the ICPs earned an excessive rate of return, for the services in question. *See infra* pp. 1554–55.

Neither can the Commission justify its interest award on the basis that the ICPs were somehow "at fault" during this hiatus period or that they took an "unauthorized discount" from WU. As the Commission has itself emphasized, a "rate gap" was inevitable in the statutory scheme that Congress saw fit to create. Although WU could not unilaterally effect a change in divisions, neither could the ICPs rely on the divisions specified in a prior agreement to continue beyond the contract's expiration date. Under the statutory scheme, both parties were responsible for reaching agreement or, failing that, for petitioning the Commission for prescription. Thus, while neither party can fairly be charged with having been "at fault" for creating the rate hiatus, the Commission has, in effect, placed the entire burden for the hiatus on the ICPs.

In view of the possible inconsistency infecting the Commission's approach, the most appropriate disposition is to remand this issue to the Commission for reconsideration and further explication.

### D

Our disposition of the interest question leads, at long last, to the final issue we are obliged to address: whether, having already found that the Commission possessed the statutory power to do so, it acted reasonably in awarding the retrospec-

tive relief it did in the circumstances of this case.

Petitioners raise substantial questions concerning the consistency of the FCC's treatment of the ICPs. The same error that flawed the Commission's treatment of the interest issue, petitioners argue, infects the Commission's approach to the actual division of revenues for the hiatus period. Essentially, the contention runs, when it came time to calculate a division, the Commission viewed its task in the manner of a conventional ratemaking case, not as a divisions case. Yet, we are reminded, it is the statute providing for division of revenues that provides the statutory authority for the Commission to act in the first place.

■ The criticism has merit. In several respects, the Commission treated the ICPs as simply five customers (albeit significant ones) of WU, rather than as separate entities for whom divisions of revenues had to be worked out under a separate statutory scheme. As we see it, the Commission focused on the proper *rate* to be charged by WU for its interconnection services rather than on a proper *division* of revenues between them. This approach manifested itself at several points in the proceeding.

For example, as we have already discussed, *see supra* p. 1543, critical to the Commission's finding that the ICPs were not entitled to a discount was the FCC's premise that "[w]ithin the process of carrier-initiated ratemaking, carriers are given considerable flexibility to average their costs among their subscriber base." *Final Decision*, 95 F.C.C.2d at 919, ¶ 93, J.A. at 289. Under those principles, the Commission found, the degree of rate averaging practiced by WU was "reasonable." But, of course, those are the very principles that the Commission has argued have no automatic application in the section 222 setting.

In addition, the FCC focused only on possible cost savings to WU in providing interconnection services to the ICPs as dis-

---

**28.** The *Final Decision,* upheld by the Second Circuit, essentially held that discounts to the ICPs were not warranted because, to the extent that there were cost savings in servicing the ICPs, they were appropriately averaged. The *Final Decision* itself at no point called a rate below full tariffed rates "unlawful."

tinguished from other customers. As the ICPs have repeatedly emphasized, the Commission made no findings regarding either WU's or the ICPs' earnings in providing outbound service. Brief for Petitioners at 40–41; Reply Brief at 7 n. 5.[29] As the ICPs point out, the Commission dismissed as "irrelevant" their claim that WU " 'has not even claimed, much less shown that the monies actually paid ... were insufficient to adequately compensate Western Union.' " *Reimbursement Order*, 102 F.C.C. 2d at 494 n. 16, J.A. at 312 (quoting [ICP] Opposition at 3). The Commission went on to offer the following reason for granting the relief that WU sought:

But for the [ICPs'] erroneous claim that they were entitled to a discount and their refusal to cooperate, WU would have been entitled to non-discounted rates from the ICPs.

*Id.* But this statement *assumes*, rather than decides, that the rate that WU initially filed on December 2, 1977 was correct all along. In our view, that explication sounds in filed rate doctrine principles rather than in divisions.

We hasten to add that, for purposes of effecting a permanent resolution of the ongoing controversy between the ICPs and WU, the Commission's approach in treating the ICPs in some ways as ordinary customers may well have been justified. Indeed, the ICPs no longer quarrel with that determination, *see* Reply Brief at 6 n. 4, and in any case the Second Circuit has upheld it. The point is, however, that that determination does not *automatically* apply to the situation of retrospective relief. It is incumbent upon the Commission to set forth a reasoned analysis of the need to apply *retrospectively* the rates it found should govern the division of charges between the parties *prospectively*.

■ And this, in our view, the Commission has failed to do. For all its detailed discussion of its statutory *authority* to or-

der retrospective relief, the Commission offered no independent justification of its *decision* to do so. This seems all the more odd when the Commission itself has acknowledged that the relief it ordered here is "drastic and unusual." *Reconsideration Order*, slip op. at 11, ¶ 60, J.A. at 337. The sole reasoning advanced by the Commission on that score was its statement that since no rates had been set during the hiatus period, "full resolution of this matter requires that we set rates for this period, when no rates were in effect, in accord with our determinations in the *Final Decision*." *Reimbursement Order*, 102 F.C.C. 2d at 496, ¶ 27, J.A. at 314 (footnote omitted). It followed from that alone, the Commission concluded, that "WU was entitled to recover the full public rate for outbound Telex/TWX services from the [ICPs] for this period." *Id.*

But, as the Commission itself has convincingly argued, this is not a section 201–205 case, and the decision to "refund" following the determination of a "lawful" rate does not follow automatically. That reflexive approach is inconsistent with the statutory mechanism that permits the Commission to order retrospective relief in the first place. Under that mechanism, it was the Commission's role to arbitrate the dispute between the parties and, in a sense, to "do equity" when agreement between them failed.

Because the Commission failed to perform this statutorily mandated role, we remand the award of retrospective relief, plus interest, to the Commission for further consideration and explication.

*Judgment accordingly.*

29. Indeed, the Commission gave notice from the beginning that its analysis would focus on the appropriate rate of discount, if any, to be enjoyed by the ICPs from WU's public rate. *Designation Order*, at 121–23, ¶¶ 65–67 & 70, J.A. at 32–35. The Commission specifically rejected an approach that would require it to make "some apportionment of total through rate charges received which takes into account the relative costs and other facts and circumstances applicable to each of the interconnected carriers." *Id.* at 121, ¶ 65, J.A. at 32.